## PACIFIC COAST DAIRY, INC. *v.* DEPARTMENT OF AGRICULTURE OF CALIFORNIA ᴇᴛ ᴀʟ.

No. 275.   Argued January 12, 13, 1943.—Decided March 1, 1943.

*Mr. Carey Van Fleet* for appellant.

By special leave of Court, *Solicitor General Fahy*, with whom *Assistant Attorney General Shea* and *Messrs. Archibald Cox* and *Morton Liftin* were on the brief, for the United States, as *amicus curiae*.

*Mr. Walter L. Bowers,* Deputy Attorney General of California, with whom *Messrs. Robert W. Kenny,* Attorney General, *W. R. Augustine,* Deputy Attorney General, *William T. Sweigert,* Assistant Attorney General, and *Bartley C. Crum* were on the brief, for appellees.

Mr. Justice Roberts delivered the opinion of the Court.

The appellant challenges a judgment of the Supreme Court of California[1] dismissing a writ of alternative mandamus and denying a permanent writ to prevent the

---

[1] 19 Cal. 2d 818, 123 P. 2d 442.

Department of Agriculture of the State from conducting a proceeding to revoke its license as a distributor of milk. The court, in denying relief, overruled several contentions, based upon the federal Constitution which are here renewed.

Chapter 10 of the Agricultural Code of California [2] provides a plan for the "stabilization and marketing of fluid milk and fluid cream." It declares their production and distribution a business affected with a public interest, and the regulation of the business an exercise of the police power; states that existing unjust, unfair, destructive and demoralizing practices menace the health and welfare of the people, despite sanitary regulations; and that it is necessary to promote intelligent production and orderly marketing by eliminating the evil practices existing in the industry.

The law empowers the Director of Agriculture to license distributors and to establish marketing areas within which uniform prices and regulations for the sale of milk shall prevail.

The appellant was a licensed distributor doing business in the Santa Clara County marketing area, in which there were in effect a stabilization and marketing plan and schedules of minimum wholesale and retail prices. It entered into a contract with the War Department of the United States, signed by the Quartermaster's Department of Moffett Field, to sell milk to the Department at Moffett Field, which lies within the boundaries of the Santa Clara County marketing area, at less than the minimum price fixed for the area. Sales and deliveries under the contract took place on Moffett Field.

A complaint was filed with the Department of Agriculture charging the appellant violated § 736.3 (a) (6) of

---

[2] Deering, 1937, Div. 4, c. 10, §§ 735–738, as amended, Deering, 1941 Supp., pp. 462–467.

the Code which provides that an unfair practice, warranting revocation of license or prosecution is:

"The purchasing, processing, bottling, transporting, delivering or otherwise handling in any marketing area of any fluid milk or fluid cream which is to be or is sold or otherwise disposed of by such distributor at any place in the geographical area within the outer, outside and external boundaries or limits of such marketing area, whether such place is a part of the marketing area or not, at less than the minimum wholesale and minimum retail prices effective in such marketing area."

This section did not appear in the Code until 1941,[3] when it was added as an amendment. California recognized its lack of power to fix retail prices for milk sold within federal enclaves located in the State.[4] But the legislature desired to accomplish this. In 1941 it memorialized Congress, requesting passage of a federal law requiring purchasing officers of the armed services purchasing food supplies for troops or agencies of the United States located in the State to refuse bids for milk at prices below those fixed under the California Milk Stabilization Law or amendments thereof.[5] The memorial was referred to the Committee on Agriculture of the House and to the Committee on Agriculture and Forestry of the Senate,[6] but was never acted upon by either committee. Congress having failed to act, § 736.3 (a) (6) and others were added to the Code, July 16, 1941, for the purpose of reaching sales on federally owned lands.

---

[3] Cal. Stats. 1941, Chap. 1214, p. 3008.

[4] Opinions of California Atty.-Gen. N. S. 1905, N. S. 1950 [1939]; *Consolidated Milk Producers* v. *Parker*, 19 Cal. 2d 815, 123 P. 2d 440; cf. *Standard Oil Co.* v. *California*, 291 U. S. 242.

[5] Cal. Stats. 1941, Chap. 65, p. 3402.

[6] 87 Cong. Rec., Part 5, 5644, 5698.

Moffett Field was acquired by the United States under an Act of Congress,[7] and it is conceded that it has always been under the exclusive jurisdiction of the federal government.[8]

The appellant sought a writ of mandamus from the court below to restrain the Department of Agriculture from proceeding to hear and act upon the pending complaint. An alternative writ issued. After return by the appellees, setting up only that the complaint failed to state facts sufficient to constitute a cause of action, the court discharged the alternative writ and denied a preemptory writ. The facts we have recited appear in the petition for the writ or are matters of which the court below and this court take judicial notice.

The Supreme Court of California overruled the appellant's contentions that the state's conceded control of activities within its jurisdiction gave it no authority to penalize transactions occurring on Moffett Field; that the state law violates the commerce clause of Article I, § 8 of the federal Constitution; that it runs afoul of Congressional action embodied in the federal Agricultural Marketing Agreement Act,[9] and that it unlawfully burdens a federal instrumentality. We find it necessary to consider only the contention first stated.

---

[7] Act of February 12, 1931, c. 122, 46 Stat. 1092. This act provides that the tract which is now called Moffett Field shall be accepted by the United States without cost to the government. The petition for mandamus alleges that, more than fifteen years ago, Moffett Field "was purchased by the Government of the United States for erecting forts, magazines, arsenals, dockyards and other needful buildings. . . ." The appellant and the government treat this allegation as conclusive, since it was not denied by the appellees. Nothing turns, in our view, on the method of acquisition.

[8] See Cal. Stats. 1897, p. 51; Political Code of California, § 34; U. S. Constitution, Art. I, § 8, clause 17.

[9] 50 Stat. 246, 7 U. S. C. 608c.

The exclusive character of the jurisdiction of the United States on Moffett Field is conceded. Article I, § 8, clause 17 of the Constitution of the United States declares the Congress shall have power "To exercise exclusive Legislation in all Cases whatsoever, over" the District of Columbia, "and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings; . . ."

When the federal government acquired the tract, local law not inconsistent with federal policy remained in force until altered by national legislation.[10] The state statute involved was adopted long after the transfer of sovereignty and was without force in the enclave. It follows that contracts to sell and sales consummated within the enclave cannot be regulated by the California law. To hold otherwise would be to affirm that California may ignore the Constitutional provision that "This Constitution, and the laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land; . . ."[11] It would be a denial of the federal power "to exercise exclusive Legislation."[12] As respects such federal territory Congress has the combined powers of a general and a state government.[13]

The answer of the State and of the court below is one of confession and avoidance,—confession that the law in fact operates to affect action by the appellant within federal territory, but avoidance of the conclusion of invalidity by the assertion that the law in essence is the regulation of conduct wholly within the state's jurisdiction.

[10] *Stewart & Co.* v. *Sadrakula,* 309 U. S. 94, 99.

[11] Art. VI, clause 2.

[12] *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 141.

[13] *Stoutenburgh* v. *Hennick,* 129 U. S. 141, 147.

The court below points out that the statute regulates only the conduct of California's citizens within its own territory; that it is the purchasing, handling, and processing by the appellant in California of milk to be sold below the fixed price—not the sale on Moffett Field—which is prohibited, and entails the penalties prescribed by the statute. And reliance is placed upon the settled doctrine that a state is not disenabled from policing its own concerns, by the mere fact that its regulations may beget effects on those living beyond its borders.[14]   We think, however, that it is without application here, because of the authority granted the federal government over Moffett Field.

In the light of the history of the legislation, we are constrained to find that the true purpose was to punish California's own citizens for doing in exclusively federal territory what by the law of the United States was there lawful, under the guise of penalizing preparatory conduct occurring in the State,—to punish the appellant for a transaction carried on under sovereignty conferred by Art. I, § 8, clause 17 of the Constitution, and under authority superior to that of California by virtue of the supremacy clause.

We have this day held in *Penn Dairies* v. *Milk Control Commission, ante*, p. 261, that a different decision is required where the contract and the sales occur within a state's jurisdiction, absent specific national legislation excluding the operation of the state's regulatory laws.   The conclusions may seem contradictory; but in preserving the balance between national and state power, seemingly inconsequential differences often require diverse results. This must be so, if we are to accord to various provisions of fundamental law their natural effect in the circumstances disclosed.   So to do is not to make subtle or tech-

---

[14] *Alaska Packers Assn.* v. *Commission*, 294 U. S. 532, 541; *Osborn* v. *Ozlin*, 310 U. S. 53, 62–63.

nical distinctions or to deal in legal refinements. Here we are bound to respect the relevant constitutional provision with respect to the exclusive power of Congress over federal lands. As Congress may, if it find the national interest so requires, override the state milk law of Pennsylvania as respects purchases for the Army, so it may, if not inimical to the same interest subject its purchasing officers on Moffett Field to the restrictions of the milk law of California. Until it speaks we should enforce the limits of power imposed by the provisions of the fundamental law.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE RUTLEDGE took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE JACKSON:

While we have joined in the opinion of the Court, we are also of the view that the judgment below should be reversed for the additional reason set forth in the dissenting opinion in *Penn Dairies* v. *Milk Control Commission, ante,* p. 261.

MR. JUSTICE FRANKFURTER, dissenting:

Both Pennsylvania and California, as part of their control over the supply and distribution of milk for the needs of their people, regulate the prices at which milk may be sold within the state. In both states, more particularly at Indiantown Gap Military Reservation, Pennsylvania, and at Moffett Field, California, units of the United States Army are stationed. At each of these sites the contracting officer, a junior officer in the Quartermaster Corps, invites bids for the sale of milk to the Army. Are these two con-

tracting officers authorized under existing federal law to accept bids that undercut the prices fixed by Pennsylvania and California for the supply of milk within their borders and thereby dislocate, in part at least, the regulatory systems established by the two states?

In *Penn Dairies* v. *Milk Control Commission, ante*, p. 261, Penn Dairies, a milk dealer of Lancaster, Pennsylvania, supplied milk for the use of the Army at Indiantown Gap Military Reservation. Their sales were the result of successful bidding at prices below the minima fixed by the Pennsylvania Milk Control Law. Subsequently, when Penn Dairies applied for renewal of its license to do business under state law, the Pennsylvania Milk Control Commission denied the application on the ground that the sales to the Army were not immune from the minimum price provisions of the Pennsylvania law. The Pennsylvania Supreme Court sustained this determination.

In this case, Pacific Coast Dairy, a milk dealer of San Francisco, California, supplied milk for the use of the Army at Moffett Field, about thirty-five miles from San Francisco. Their sales, too, were the result of successful bidding at prices below those fixed by California law. For thus departing from the price provisions of the state law under which it was licensed to do business, the California Department of Agriculture instituted proceedings to revoke Pacific Coast Dairy's license. To stay these proceedings the dairy sought a writ of mandamus, which was denied by the Supreme Court of California.

In my view, the Court in upholding the refusal by Pennsylvania to renew a license because of an arrangement made on behalf of the Government must imply that the contracting officer of the Indiantown Military Gap Reservation was not authorized to accept bids below the minimum price requirements set by Pennsylvania for the sale of milk within the state. In the California case, how-

ever, the Court holds that the contracting officer for Moffett Field may, in the case of sales and deliveries made on Moffett Field, contract at prices below those fixed by California for the sale of milk within its borders. Opposite legal results are thus reached for precisely the same practical situations. The justification for this incongruity in defining the scope of the authority of the two contracting officers is attributed to the difference in the nature of the Government's proprietary interest in each of the two Army sites. Indiantown Gap Military Reservation is held by the United States under lease from the Commonwealth of Pennsylvania. Moffett Field belongs to the United States outright. On the basis of this difference in the federal Government's proprietary interest in the two Army facilities, Indiantown Gap Military Reservation is deemed not to be within the "exclusive jurisdiction" of the Government while Moffett Field is deemed within such "exclusive jurisdiction." And from this classification it is deduced that milk sold to the Army for the use of our soldiers at Indiantown Gap Military Reservation must comply with the price provisions of Pennsylvania law, but that milk may be sold to the Army for the use of our soldiers at Moffett Field in disregard of the minimum prices set by California.

Legal refinements are not always the worse for eluding the quick understanding of a layman. But I do not believe that in determining the duty of contracting officers serving the same Army function—a matter that turns on considerations of policy in the relation of the various Army posts to the states in which they are situated—legal categories compel a difference in result where practical judgment and experience lead to an identity in result. The power given to Congress by Article I, § 8 of the Constitution, to "exercise exclusive Legislation" over federal enclaves is not so tyrannical as to preclude in law what good sense requires.

The so-called exclusive jurisdiction drawn from the grant to Congress of power to legislate exclusively has, as a matter of historical fact, become increasingly less and less exclusive. In early days when the activities of the federal Government made only negligible inroads upon territorial areas within the states, it was assumed that federal exclusiveness was a fact rather than a potentiality, and that the states were precluded from reserving authority in lands within the state which were ceded to the Government. But this notion never became law, and has now been formally repudiated. "The possible importance of reserving to the State jurisdiction for local purposes which involve no interference with the performance of governmental functions is becoming more and more clear as the activities of the Government expand and large areas within the States are acquired." *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 148; and see *Silas Mason Co.* v. *Tax Comm'n*, 302 U. S. 186. Indeed, in the case of Moffett Field itself the authority of the United States is not in any true sense exclusive, even as to matters of political authority, for California's act of cession provided that both criminal and civil process issued by California should have the same sanction on Moffett Field as elsewhere in the state.

Since exclusive authority need not be exercised by Congress, there is at times "uncertainty and confusion" whether jurisdiction belongs to the federal Government or has been left with the state. *Bowen* v. *Johnston,* 306 U. S. 19, 27. And although the acts of cession may leave "no room for doubt" that "jurisdiction" "remained with the State," "administrative construction" may nevertheless generate federal jurisdiction. *Id.*, at 29. Even where the federal Government supposedly has "exclusive" jurisdiction, a close examination of complicated legislation may uphold excise tax provisions of a state alcoholic beverage control law but not provisions that "go beyond aids

to the collection of taxes and are truly regulatory in character." *Collins* v. *Yosemite Park Co.*, 304 U. S. 518, 533. And while lip service is paid to the doctrine of "exclusive jurisdiction" by professing to absorb for federal enclaves those laws of the state which were enforced there prior to its cession, the liberality with which state social measures are deemed not to impinge upon the national purposes for which the enclave was established, is a recognition in fact that the Constitution permits sensible adjustments between state and federal authority although activities subject to legal control take place on federal territory within a state. See, *e. g., Stewart & Co.* v. *Sadrakula*, 309 U. S. 94.

Enough has been said to show that the doctrine of "exclusive jurisdiction" over federal enclaves is not an imperative. The phrase is indeed a misnomer for the manifold legal phases of the diverse situations arising out of the existence of federally-owned lands within a state—problems calling not for a single, simple answer but for disposition in the light of the national purposes which an enclave serves. If Congress speaks, state power is of course determined by what Congress says. If Congress makes the law of the state in which there is a federal site as foreign there as is the law of China, then federal jurisdiction would really be exclusive. But short of such Congressional assertion of overriding authority, the phrase "exclusive jurisdiction" more often confounds than solves problems due to our federal system.

It is certainly an irrelevant factor in the legal equation before us. For in neither the Pennsylvania nor the California case is the power of Congress or of appropriately exercised military authority called into question. As to Pennsylvania, the Court has found that neither Congressional legislation nor discernible legislative policy immunized a government contractor from state regulation. Of course, if Congressional policy, howsoever expressed,

authorized the Quartermaster to enter into such a contract in disregard of local milk price control legislation, the contractor would be immune from obedience to local requirements. Nor has controlling assertion of military authority to disregard local price control been found. There is no suggestion that Congress or the Army has a policy regarding the purchase of milk for soldiers stationed in California which differs from that in Pennsylvania. State regulation, we have held in the case of Pennsylvania, "imposes no prohibition on the national government or its officers." Neither does the California regulation. It clearly does not as to federal sites in California which have been leased to the Government, like the Indiantown Gap Military Reservation, or to sites where the state has reserved concurrent jurisdiction, like those in the *Dravo* and *Mason* cases, *supra*, or to federal territory where jurisdiction is doubtful or ambiguous, like the reservation in *Bowen* v. *Johnston, supra*. The California Supreme Court advises us that within the confines of California the United States is engaged in a great variety of activities: "The federal territory within the state is so fragmented that there may be several federal islands within a single marketing area. If they are citadels of immunity from state jurisdiction, they are also exceptional segments in areas that are otherwise subject to that jurisdiction. They stand out like colored pins on the map of California, and range from military reservations to soldiers' homes, from court houses to penitentiaries, from post offices to Indian reservations, from national parks to regional dams." 19 Cal. 2d 818, 828.

Can it be that the considerations of policy which resulted in a finding that neither the Constitution nor Congressional authority nor appropriate military regulation enabled the Army contracting officer in Pennsylvania, in supplying milk to the soldiers stationed in Pennsylvania, to free local dealers from the necessity of complying with

a social measure not unrelated to health and deemed important to the welfare of the people of Pennsylvania, are present in some parts of California and not in others? And must a junior contracting officer of the Quartermaster Corps now attempt to ascertain whether these considerations of policy do or do not apply, depending upon whether the particular enclave is within the "exclusive jurisdiction" of the federal Government—a question so recondite, as the cases show, that it may be settled only by this Court after long travail? Is the result to turn upon the niceties of the law of sales and contracts? Suppose, for example, that the negotiations occur and the contracts are signed off Moffett Field, but delivery takes place there. Must inquiry be made as to where title has "passed" and the sale consummated?

These are not far-fetched suppositions. They are the inevitable practical consequences of making decision here depend upon technicalities of "exclusive jurisdiction"—legal subtleties which may become relevant in dealing with prosecution for crime, devolution of property, liability for torts, and the like, but which as a matter of good sense surely are wholly irrelevant in defining the duty of contracting officers of the United States in making contracts in the various States of the Union, where neither Congress nor the authoritative voice of the Army has spoken. In the absence of such assertion of superior authority, state laws such as those here under consideration appear, as a matter of sound public policy, equally appropriate whether the federal territory encysted within a state be held on long or short term lease or be owned by the Government on whatever terms of cession may have been imposed.

We are not dealing here with the authority of Congress, about which there can be no controversy, but with the authority of Government contracting officers. It is surely the policy of neither Congress nor the Army that such

authority should vary from state to state or from post to post within the same state. On the contrary, there is every reason for assuming that, in the matter here involved, uniformity throughout the land is deemed an essential element of the national policy. Since, as the Court holds in the Pennsylvania case, the national interest is furthered rather than impaired by requiring the Quartermaster at the Indiantown Military Reservation to observe the Pennsylvania Milk Control Law, there is every reason why the Quartermaster at Moffett Field should likewise observe the similar California law. And since he should observe the state law, California has a right to insist that the milk dealer licensed by it should not participate in a violation of the law of his state, by license from which he does business.

MR. JUSTICE MURPHY, dissenting:

I dissent for reasons stated in concurrence in *Penn Dairies* v. *Milk Control Commission, ante,* p. 261. The fact that Moffett Field is a federal enclave instead of a leasehold does not justify denying California the power to protect the public health by requiring milk dealers selling to the United States to receive a minimum price, a power which we have today held that Pennsylvania possesses. True, Congress is given the power "to exercise exclusive legislation" over federal areas such as Moffett Field (Constitution, Art. I, § 8, cl. 17), but that does not necessarily mean that the States, no matter what their interest or need, are absolutely without power to enact legislation, not inconsistent with Congressional policy or Constitutional dictates, which will apply in some measure to those areas which are within their boundaries. Before holding that this clause invalidates important state legislation like that now before us, especially at a time when federal activities are greatly expanding and vast areas are being acquired within the States by the federal

government, the reasonableness and necessity of such a decision should be thoughtfully examined.

We derive much of our strength as a nation from our dual system of federal government. To promote the harmonious working of that system the general clauses of the Constitution which broadly delineate the boundaries of state and national power should be construed by appraising the respective state and national interests involved and striking a balance which gives appropriate recognition to the legitimate concerns of each government. Since those boundaries are not absolutes, the question necessarily is one of reasonableness and degree. Cf. Holmes, J., dissenting in *Panhandle Oil Co.* v. *Knox,* 277 U. S. 218, 222, and again in *Springer* v. *Philippine Islands,* 277 U. S. 189, 209–210. This is the method which we have applied in testing state regulation of interstate commerce,[1] and it should govern the construction of the "exclusive legislation" clause. If a state is acting in matters normally within its competence, with which it is especially equipped to deal, to achieve important governmental ends such as the protection of the public health and welfare or the maintenance of orderly marketing conditions, the effects of its action should be allowed to extend into federal areas within its

---

[1] While it is Congress that is given the power to regulate commerce among the States, some state regulation of that commerce is permissible. "When Congress has not exerted its power under the Commerce Clause, and state regulation of matters of local concern is so related to interstate commerce that it also operates as a regulation of that commerce, the reconciliation of the power thus granted with that reserved to the state is to be attained by the accommodation of the competing demands of the state and national interests involved." *Parker* v. *Brown,* 317 U. S. 341, 361–363. State regulation is to be upheld if "upon a consideration of all the relevant facts and circumstances it appears that the matter is one which may appropriately be regulated in the interest of the safety, health and well-being of local communities, and which, because of its local character and the practical difficulties involved, may never be adequately dealt with by Congress." *Ibid.,* p. 362.

boundaries unless inconsistent with an act of Congress or the provisions or necessary implications of the Constitution. This formula allows the States to carry out important programs which must be of state-wide application to be effective and adequately recognizes the paramount character of federal power. Since we have held the comparable Pennsylvania statute does not contravene any act of Congress or the Constitution (*Penn Dairies* v. *Milk Control Commission, supra*), the instant California legislation satisfies this test.

The "exclusive legislation" clause has not been regarded as absolutely exclusory,[2] and no convincing reason has been advanced why the nature of the federal power is such that it demands that all state legislation adopted subsequent to the acquisition of an enclave must have no application in the area. In waging war under modern conditions it is essential that state and national, military and civilian authorities, work together as a unit, each complementing the others. The state governments have functions to perform that are vital to the war program, including those functions pertaining to the public health. So long as there is no overriding national purpose to be served, nothing is gained by making federal enclaves thorns in the side of the States and barriers to the effective state-wide performance of those functions. Indeed both the federal government and the nation as a whole suffer if the solution of legitimate matters of local concern is thus thwarted and local animosity created for no purpose.

---

[2] The common sense view has been taken that even though Congress has not legislated to that effect, local law existing at the time an enclave is acquired, which does not defeat the national purpose, remains in effect within the enclave until altered by Congress. *Stewart & Co.* v. *Sadrakula*, 309 U. S. 94. And the States may qualify their consent to the federal government's purchase by retaining some measure of jurisdiction. *James* v. *Dravo Contracting Co.*, 302 U. S. 134.

A disposition on the part of the federal government or its military arm to ignore local regulations such as the present one is not only fraught with danger to the public health, but also may create a public feeling of distrust which itself will hamper the military effort.

If Congress exercises its paramount legislative power over Moffett Field to deny California the right to do as it has sought to do here, the matter is of course at an end. But until Congress does so, it should be the aim of the federal military procurement officers to observe statutes such as this established by state action in furtherance of the public health and welfare, and otherwise so conduct their affairs as to promote public confidence and good will.