## MAYO ET AL. *v.* UNITED STATES.

No. 726.   Argued April 16, 1943.—Decided June 1, 1943.

*Messrs. Wm. C. Pierce* and *James H. Millican, Jr.,* Assistant Attorney General of Florida, with whom *Messrs. J. Tom Watson,* Attorney General of Florida, and *H. E. Carter* were on the brief, for appellants.

*Assistant Attorney General Shea,* with whom *Solicitor General Fahy* and *Messrs. Sidney J. Kaplan, Martin Norr* and *Richard S. Salant* were on the brief, for the United States.

*Messrs. William N. McQueen,* Acting Attorney General of Alabama, *Eugene Stanley,* Attorney General of Louisiana, *Harry McMullan,* Attorney General of North Carolina, and *Thomas J. Herbert,* Attorney General of Ohio, on behalf of their respective States, as *amici curiae,* adopted the brief of appellants.

MR. JUSTICE REED delivered the opinion of the Court.

This record presents for review the action of a specially constituted district court in enjoining, on final hearing, the Commissioner of Agriculture of the State of Florida and his agents from enforcing against the United States the provisions of the Florida Commercial Fertilizer Law. Judicial Code, §§ 266 and 238.

By this Florida act the sale or distribution of commercial fertilizer is comprehensively regulated. There is included a requirement of a label or stamp on each bag evidencing the payment of an inspection fee. Unless so identified, the bags may be seized and sold by the sheriff of the county. The purpose of the legislation is to assure the consumers that they will obtain the quality of fertilizer for which they pay and that substances deleterious to the land will be excluded from the material sold. Florida Statutes, 1941, c. 576.

The United States, under the direction of the Secretary of Agriculture, acting under the provisions of the Soil Conservation and Domestic Allotment Act,[1] purchased commercial fertilizer outside of Florida and undertook its distribution to consumers within that state during the fiscal year ending June 30, 1943, without state inspection and without paying for or affixing to the bags the inspection stamps required by the Florida act. This distribution was a part of the national soil conservation program.[2] Through

---

[1] 49 Stat. 163, 1148; 50 Stat. 329; 55 Stat. 257, 860; 56 Stat. 664.

[2] §§ 7 and 8 of the Soil Conservation and Domestic Allotment Act, as amended.

the use of fertilizers with a high content of superphosphate on winter legumes the plan sought, by plowing under the legumes, to obtain scarce nitrogen for the commercial crops which were to follow. To secure a heavy growth of the legumes before plowing time, the fertilizer should be applied and the legumes planted prior to October 15th. Farmers who desire to participate in the conservation program follow the required practices under the supervision of county committees or associations which are federal instrumentalities for carrying out the plans. § 8 (b).

The soil-building and soil-conserving practices, when carried out by a participating farmer, entitle him to a grant or benefit payment. § 8. In order that the farmer may earn this grant, phosphate fertilizers are furnished to him in advance by the Government through the county committee. The cost is deducted from the grant. For the purpose of carrying out the program, the United States caused fertilizers purchased by its agents to be shipped into Florida to the local agricultural associations for such distribution. As the sacks were without stamps, the Florida Commissioner of Agriculture on September 10, 1942, gave a "stop sale" notice to the county agricultural association to cease distribution.

The Attorney General of the United States directed the filing of a complaint against the Florida officials who are charged with the enforcement of the Florida law. The complaint set out the "stop sale" notice, the refusal of numerous persons utilized by the United States in its work to proceed with the distribution of the fertilizer without the protection of an injunction, the frustration of the conservation program of the Secretary of Agriculture, the imminency of irreparable damage because of the necessity of prompt distribution of the fertilizer and the lack of any efficient remedy other than a temporary and permanent injunction. Florida objected to the complaint for failure to state a cause of action and set up numerous defenses

which have now been reduced by the specification of errors and the brief to the fundamental one that the United States as to fertilizer to be used upon Florida soil is not exempt by Constitution or statute from compliance with reasonable state regulation or the payment of reasonable inspection fees. At any rate, it is urged, inspection fees may be collected under the facts heretofore stated as the Government is merely a conduit or service agent for the fertilizer manufacturer or the Florida farmer.

The District Court disposed, we think, of the conduit or service agent argument by its finding that the Government "became the owner" of the fertilizer at the manufacturing plants which are outside the state and was engaged in distributing it in Florida as a part of the national soil conservation program. In promoting soil conservation by precept and demonstration through the Department of Agriculture, the United States, as in its other authorized activities, acts in a governmental capacity.[3] Prior to the Soil Conservation Act, Congress had, as a matter of custom, put money and responsibility in the hands of the executive to promote agriculture in the most general sense. It is commonplace for appropriations to be made for loans to farmers.[4] The distribution of fertilizer owned by the United States as a charge against grants to aid soil conservation is of the same character. § 8 (b). Cf. *United States* v. *Butler*, 297 U. S. 1, 65, 68. No inference of fact or conclusion of law, we think, can be properly drawn from the circumstances of this fertilizer

[3] *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466, 477; *Pittman* v. *Home Owners' Loan Corp.*, 308 U. S. 21, 32; *Federal Land Bank* v. *Bismarck Co.*, 314 U. S. 95, 102.

[4] Establishment of the Department of Agriculture, 12 Stat. 387; of colleges of agriculture, 26 Stat. 417; Federal Farm Loan Act, 39 Stat. 360, 40 Stat. 431; Federal Intermediate Credit Banks, 42 Stat. 1454; Federal Farm Board, 46 Stat. 11; boll weevil grant, 45 Stat. 539, 565.

distribution other than that the United States was the owner of the fertilizer in Florida awaiting distribution.

The other findings are substantially in accord with the allegations of the complaint and are not contested. The District Court, one judge dissenting, enjoined the application of Florida law to the above described acts of the United States on the ground of federal immunity from state regulation.

Since the United States is a government of delegated powers, none of which may be exercised throughout the Nation by any one state, it is necessary for uniformity that the laws of the United States be dominant over those of any state. Such dominancy is required also to avoid a breakdown of administration through possible conflicts arising from inconsistent requirements. The supremacy clause of the Constitution states this essential principle. Article VI. A corollary to this principle is that the activities of the Federal Government are free from regulation by any state.[5] No other adjustment of competing enactments or legal principles is possible.

Appellants' argument in support of the inspection fee is that neither the Constitution nor any federal statute exempts the United States from paying reasonable state inspection fees to support permissible regulation of commercial fertilizer. Such inspections are allowable where the United States is not the owner. *Patapsco Guano Co. v. North Carolina,* 171 U. S. 345; *Red "C" Oil Co. v. North Carolina,* 222 U. S. 380, 392. Appellants urge that since they are allowable to protect the farmers against the imposition of fertilizers of quality possibly inferior to the manufacturers' representations, the inspection fee should

---

[5] *McCulloch v. Maryland,* 4 Wheat. 316, 427; *Ohio v. Thomas,* 173 U. S. 276, 283; *Owensboro National Bank v. Owensboro,* 173 U. S. 664, 667; *Johnson v. Maryland,* 254 U. S. 51; *Arizona v. California,* 283 U. S. 423, 451.

be paid on fertilizers distributed by the United States, where the federal law is silent as to any exemption on the ground of sovereignty. Reliance is placed upon *Graves v. New York ex rel. O'Keefe,* 306 U. S. 466.

It lies within Congressional power to authorize regulation, including taxation, by the state of federal instrumentalities.[6] No such permission is granted here. Compare 56 Stat. 664. Congress may protect its agencies from the burdens of local taxation.[7] There are matters of local concern within the scope of federal power which in the silence of Congress may be regulated in such manner as does not impair national uniformity.[8] There are federal activities which in the absence of specific Congressional consent may be affected by state regulation.[9] *Graves v. New York ex rel. O'Keefe, supra,* upon which appellants rely so strongly, is in this latter group. In that case, an employee of the Home Owners' Loan Corporation, a Federal agency which was assumed to have the same immunity from state taxation as the United States itself, sought exemption from New York's income tax on the ground that a tax upon the employee's salary imposed an unconstitutional burden upon the Federal Government. This position was not without precedent.[10] Upon full reëxamination of the authorities and the reasoning upon which the earlier cases had allowed the em-

---

[6] *Owensboro National Bank* v. *Owensboro,* 173 U. S. 664, 667; *Baltimore National Bank* v. *Tax Comm'n,* 297 U. S. 209; *Pacific Coast Dairy* v. *Dept. of Agriculture,* 318 U. S. 285, 296.

[7] *Pittman* v. *Home Owners' Loan Corp.,* 308 U. S. 21, and cases cited.

[8] *Standard Dredging Corp.* v. *Murphy, ante,* p. 306; *California* v. *Thompson,* 313 U. S. 109.

[9] *Alabama* v. *King & Boozer,* 314 U. S. 1, 9, and cases cited.

[10] *Dobbins* v. *Commissioners,* 16 Pet. 435; *Collector* v. *Day,* 11 Wall. 113; *New York ex rel. Rogers* v. *Graves,* 299 U. S. 401; *Brush* v. *Commissioner,* 300 U. S. 352.

ployees of one sovereignty freedom from the exactions of the other, this Court declared that in the absence of a federal declaration of immunity from state taxation, no such "tangible or certain economic burden is imposed on the [United States] as would justify a court's declaring that the [employee] is clothed with the implied constitutional tax immunity of the government by which he is employed." Page 486.

These inspection fees are laid directly upon the United States. They are money exactions the payment of which, if they are enforceable, would be required before executing a function of government. Such a requirement is prohibited by the supremacy clause. We are not dealing as in *Graves* v. *New York ex rel. O'Keefe, supra,* with a tax upon the salary of an employee, or as in *Alabama* v. *King & Boozer,* 314 U. S. 1, with a tax upon the purchases of a supplier, or as in *Penn Dairies* v. *Milk Control Comm'n,* 318 U. S. 261, with price control exercised over a contractor with the United States. In these cases the exactions directly affected persons who were acting for themselves and not for the United States. These fees are like a tax upon the right to carry on the business of the post office or upon the privilege of selling United States bonds through federal officials. Admittedly the state inspection service is to protect consumers from fraud but in carrying out such protection, the federal function must be left free.[11] This freedom is inherent in sovereignty. The silence of Congress as to the subjection of its instrumentalities, other than the United States, to local taxation or regulation is to be interpreted in the setting of the appli-

---

[11] Similar conclusions have been reached in adjacent fields. The state is powerless to punish its citizens for acts done in exclusively federal territory. *Pacific Coast Dairy* v. *Dept. of Agriculture,* 318 U. S. 285. A state cannot tax land of the United States situated within the state even though the state has not ceded sovereignty to the United States. *Van Brocklin* v. *Tennessee,* 117 U. S. 151, 177.

cable legislation and the particular exaction. *Shaw* v. *Gibson-Zahniser Oil Corp.*, 276 U. S. 575, 578. But where, as here, the governmental action is carried on by the United States itself and Congress does not affirmatively declare its instrumentalities or property subject to regulation or taxation, the inherent freedom continues.

*Affirmed.*

MR. JUSTICE BLACK concurs in the result.