FILED
United States Court of Appeals
Tenth Circuit

August 10, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JIMMIE ALLISON,

       Plaintiff-Appellant,

v.

BOEING LASER TECHNICAL
SERVICES,

       Defendant-Appellee.

No. 10-2237

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CIV-09-00275-RHS-LFG)**

---

Michael L. Danoff, Michael Danoff & Associates, P.C., Albuquerque, New Mexico, for Appellant.

James K. Mackie (Erica K. Rocush with him on the brief), Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Tucson, Arizona, for Appellee.

---

Before **TYMKOVICH**, **SEYMOUR**, and **GORSUCH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

      Under a body of constitutional law applicable to federal enclaves, U.S. Const. art. I, § 8, cl. 17, state law that is adopted after the creation of the enclave generally does not apply on the enclave. A federal enclave is created when a state

cedes jurisdiction over land within its borders to the federal government and Congress accepts that cession. These enclaves include numerous military bases, federal facilities, and even some national forests and parks. Federal enclave doctrine operates as a choice of law doctrine that dictates which law applies to causes of action arising on these lands.

It is well-established that after a state has transferred authority over a tract of land creating a federal enclave, the state may no longer impose new state laws on these lands. But state laws enacted before the cession continue to apply unless Congress specifically overrides them. The question here is whether *state common law* causes of action recognized after the state ceded the enclave to the federal government are available on federal enclaves. This question is governed by a long string of Supreme Court precedent that makes it clear that the law on a federal enclave is the state law that governed the land at the time the federal government established the enclave, not state law enacted thereafter—unless that law was expressly adopted by the enclave's new sovereign, the federal government.

Jimmie Allison's causes of action arose from conduct on Kirtland Air Force Base, a federal enclave established in 1954. Because Allison's state law claims are based on legal theories created by common law after that date, they are barred unless federal statutory law allows them to go forward. Because no federal statute authorizes state employment and tort claims of the sort here to be asserted

-2-

against federal contractors, Allison's suit is barred by the federal enclave doctrine.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we therefore AFFIRM.

## I. Background

Allison was a civilian employee of Boeing Laser Technical Services, a federal contractor located on Kirtland Air Force Base. Kirtland Air Force Base is a federal enclave: it is located on land that New Mexico ceded to the federal government in 1952 and 1954. Since that time the federal government has exercised exclusive jurisdiction within the boundaries of the Base.

Allison was terminated by Boeing on December 31, 2007. He filed suit in state court, alleging that Boeing discharged him in retaliation for reporting corporate fraud to the Air Force. His claims were all based on state law theories—wrongful discharge, breach of implied contract, breach of covenant of good faith and fair dealing, retaliatory discharge, prima facie tort, and defamation.

Boeing removed the case to federal court and moved for summary judgment, asserting that these causes of action (except for defamation) are not available for conduct occurring on Kirtland Air Force Base under the federal enclave doctrine. The district court granted partial summary judgment in favor of Boeing on all of Allison's employment claims on the ground that those causes of

action were not recognized by New Mexico courts prior to 1954. The defamation claim was dismissed, and the district court entered final judgment in favor of Boeing.

# II. Discussion

Allison challenges the district court's dismissal of his employment claims, arguing that the federal enclave doctrine does not displace state common law adopted after the cession of Kirtland in 1954.

### A. Federal Enclave Doctrine

The Constitution empowers Congress to exclusively regulate properties acquired from state governments. Congress "shall have Power"

> *To exercise exclusive Legislation . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be*, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. Const. art. I, § 8, cl. 17 (emphasis added).[1]

Thus, when "the United States acquires with the 'consent' of the state legislature land within the borders of that State . . . the jurisdiction of the Federal Government becomes 'exclusive.'" *Paul v. United States*, 371 U.S. 245, 264 (1963). "The power of Congress over federal enclaves that come within the scope of Art. I, § 8, cl. 17, is obviously the same as the power of Congress over the

---

[1] The federal government may also create these enclaves by reserving jurisdiction when a state first enters the Union. *Kelly v. Lockheed Martin Services Group*, 25 F. Supp. 2d 1, 3 (D. Puerto Rico 1998).

District of Columbia" and "by its own weight, bars state regulation without specific congressional action." *Id*. at 263. This exclusive jurisdiction is "legislative," meaning the laws and statutes applied to these locations must be supplied by the federal government, not the states. *Pac. Coast Dairy v. Dep't of Ag. of Cal.*, 318 U.S. 285, 294 (1943). "When Congress legislates with respect to the District of Columbia and federal enclaves it acts as a state government with all the powers of a state government," and thus "Congress acts as a state government with total legislative, executive and judicial power." *United States v. Jenkins*, 734 F.2d 1322, 1325–26 (9th Cir. 1983).

Over the years, Congress has enacted assimilative laws that permit some state laws—particularly criminal laws—to apply to federal enclaves and that allow state crimes to be prosecuted in federal courts. *See United States v. Sharpnack*, 355 U.S. 286, 294–95 (1958). But in many important areas of law that are traditionally the responsibility of states—including most state employment law—there is no federal assimilative statute.

The central principle of federal enclave doctrine is that Congress has exclusive legislative authority over these enclaves. But in the absence of applicable federal legislation displacing state law, those state laws that existed at the time that the enclave was ceded to the federal government remain in force. "Since a State may not legislate with respect to a federal enclave unless it reserved the right to do so when it gave its consent to the purchase by the United

-5-

States, only state law existing at the time of the acquisition remains enforceable, not subsequent laws." *Paul*, 371 U.S. at 268. Thus, the federal government acquires property subject to state law.

> The Constitution does not command that every vestige of the laws of the former sovereignty must vanish. On the contrary its language has long been interpreted so as to permit the continuance until abrogated of those rules existing at the time of the surrender of sovereignty which govern the rights of the occupants of the territory transferred. This assures that no area however small will be left without a developed legal system for private rights.

*James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 99–100 (1940). And even though state law will not remain static outside the enclave, any changes made to the state law applicable within the enclave must be a matter of federal law. Because "future statutes of the state are not a part of the body of laws in the ceded area," "Congressional action is necessary to keep [state law] current." *James Stewart*, 309 U.S. at 100.

Like most general principles, the law of federal enclaves admits exceptions. The Supreme Court has recognized at least three exceptions to the rule that only state law in effect at the time of cession applies within the federal enclave: 1) where Congress has, by statute, provided a different rule; 2) where the state explicitly retained the right to legislate over specific matters at the time of cession; and 3) where minor regulatory changes modify laws existing at the time of cession.

The first exception recognizes the obvious fact that Congress can legislate on behalf of the enclave and may provide for the application of state laws enacted after the creation of the enclave. *See Sharpnack*, 355 U.S. at 294–95. Thus, for example, the first Federal Crimes Act, enacted in 1790, defined a number of federal crimes that applied to federal enclaves, and in 1825 Congress adopted the first Assimilated Crimes Act, which allowed state criminal codes to apply to crimes committed on federal enclaves. *Id*. at 288, 290. State criminal codes now apply to crimes committed on military bases, Indian reservations, federal facilities, and public lands unless other federal statutes bar their application. Congress has also allowed the application of state law to a variety of civil claims in federal enclaves, such as wrongful death, 16 U.S.C. § 457; workers' compensation, 40 U.S.C. § 3172; unemployment compensation, 26 U.S.C. § 3305(d); and fish and game regulation, 10 U.S.C. § 2671.

But no federal statute yet allows the broad application of state employment, tort, and contract law to federal enclaves. And "it is well established that in order for Congress to subject a federal enclave to state jurisdiction, there must be a specific congressional deferral to state authority over federal property." *West River Elec. Ass'n, Inc. v. Black Hills Power and Light Co.*, 918 F.2d 713, 719 (8th Cir. 1990).

The second exception deals with those powers the states expressly reserved at the time of cession. In *James v. Dravo Contracting Co.*, 302 U.S. 134, 148–49

(1937), the Supreme Court upheld the power of states to transfer only partial jurisdiction to the federal government, retaining some authority over the ceded lands. Common reservations of power include the authority to collect state taxes and the right to serve civil and criminal process within an enclave. *See*, *e.g.*, *James*, 302 U.S. at 149, and *Paul*, 371 U.S. at 266 (discussing West Virginia and California federal enclave cession consent statutes). Reservations may also be much broader, preserving a wide range of state powers. *See United States v. Fields*, 516 F.3d 923, 929 (10th Cir. 2008) (explaining that an Oklahoma cession statute "indicates that the United States is being ceded full civil and criminal jurisdiction, with a concurrent jurisdiction reserved to the State").

The third exception applies to minor regulatory changes to state programs that existed at the time of cession. In *Paul,* the Supreme Court considered state regulatory schemes that were in place when the state ceded sovereignty but required ongoing maintenance from a regulatory body. The Court found, for example, that changes in milk pricing regulations applicable on a federal enclave might be permissible "provided the basic state law authorizing such control has been in effect since the time[] of [cession]." *Paul*, 371 U.S. at 269.

With this general framework in mind, we turn to the employment laws of New Mexico, and whether they apply on Kirtland Air Force Base.

### B. *Application of New Mexico Employment Law*

Under federal enclave law no New Mexico law adopted after 1954 applies on Kirtland Air Force Base unless it fits under one of the three exceptions discussed above. As to the first exception, no federal statute authorizes the application of New Mexico employment law enacted after 1954 to the Base. All of Allison's employment and tort claims are based on common law causes of action that arose after 1954, so on its face the enclave doctrine presents an obstacle to Allison's claims. Given this obstacle, Allison makes several arguments why we should disregard traditional federal enclave principles or give New Mexico law retroactive effect under the second and third exceptions described above.

He first argues that the Supreme Court would disregard its precedent and instead apply a rule that only state law *inconsistent* with federal law does not apply on federal enclaves. He then asks us to find that federal enclave doctrine does not apply to New Mexico common law. In support of this second argument he presents three theories: Federal enclave law (1) does not apply to judge-made common law at all; (2) was displaced by New Mexico common law because a New Mexico statute in effect prior to 1954 authorizes future changes to the common law of contracts and employment; and (3) would recognize new employment-related causes of action because they fall within the regulatory exception carved out by *Paul*.

We find none of these arguments persuasive.

*1. Modification of Federal Enclave Law*

Allison first asks us to modify federal enclave law and conclude that all state laws that do not conflict with federal law or policy are applicable on federal enclaves. This position is at odds with binding Supreme Court precedent.

In support of this argument, Allison points to *Howard v. Comm'rs of Sinking Fund of City of Louisville*, 344 U.S. 624 (1953). In that case, the Supreme Court allowed the City of Louisville to annex land containing a federal enclave (a Naval ordinance plant) and impose municipal taxes on its employees. In rejecting the argument that employees at the plant were immune from city taxes, the Court found the "fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government." *Id*. at 627. As a result, the Court found that a state may lawfully redraw "its municipal structures," even when those structures include an enclave, *id.* at 626, and that those municipal organizations may then tax employees on the enclave. Since federal law specifically granted the power to tax to the states and to "any duly constituted taxing authority therein," *id*. at 627, the Court found no conflict with federal enclave principles. But nothing in *Howard* suggests the Court retreated from the rule that only state laws in affect at cession apply to the enclave. "*Howard* does nothing to alter the exercise of exclusive

-10-

federal jurisdiction over federally-owned territory." *Black Hills Power and Light Co. v. Weinberger*, 808 F.2d 665, 670–71 (8th Cir. 1987). To accept Allison's argument, we would have to conclude that *Howard* swallowed most of federal enclave law.

In any event, the Supreme Court unambiguously affirmed the general rule that we look to the date of cession to determine which state laws apply to the federal enclave in *Paul*, decided a decade after *Howard*. That rule is binding on us. Even if we doubted the wisdom of Supreme Court precedent on this point, we are not free to ignore it: "[O]ur job as a federal appellate court is to follow the Supreme Court's directions, not pick and choose among them as if ordering from a menu." *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1243 (10th Cir. 2008).[2]

Allison makes a final related argument—that federal enclave law creates an unequal and fundamentally unfair system by not allowing a remedy for certain wrongful conduct on enclaves. But Allison does not explain why the federal law that applies to the enclave is inadequate and inferior as a whole. While not every cause of action recognized by state law applies to conduct on a federal enclave, that is a natural result of the relationship between the state and federal sovereigns.

---

[2] One commentator suggests the Supreme Court in *Evans v. Cornman*, 398 U.S. 419 (1970), adopted and extended the "no interference" rationale of *Howard* to the point of largely overruling *Paul*. We see no conflict between these two lines of cases. *Evans* merely affirmed that *residents* of a federal enclave are citizens of the state and have the right to vote in state and local elections. *See* R. Haines, Jr., *Federal Enclave Law* 8 (2011).

-11-

Allison has exactly the same rights that a plaintiff in New Mexico would have had in 1954, plus any additional federal rights that have been created since that time, including all of the federal civil rights laws and employment compensation laws.

In sum, we see no fundamental unfairness in holding that the only causes of action available for controversies arising on Kirtland are those that were recognized before the land was ceded to the exclusive federal jurisdiction of the United States in 1954.

### 2. *Common Law Claims*

Allison next makes a series of related arguments attempting to show that the New Mexico common law of employment is not displaced by federal enclave law. He argues that either (1) federal enclave doctrine does not apply to the common law developed by judges, rather than legislatures, or (2) New Mexico statutory law, in particular, operates to make changes in common law causes of action retroactive.

### *Common Law Exemption*

Allison first claims state common law is exempt from federal enclave analysis. Thus he argues that even if later-adopted state statutes do not apply to the enclave, the same is not true for changes to state common law. In support of this proposition, he points to the lack of binding Supreme Court precedent on the application of federal enclave principles to evolving common law doctrine and urges us to limit the application of federal enclave doctrine to state statutes.

We see no principled reason to treat state common law differently than state statutory law. Judge-made common law is no different than legislature-made law in application and effect. When a state court adopts a new cause of action through its common-law powers, that cause of action functions no differently than if it had been created by the state legislature. "The common law so far as it is enforced in a State, whether called common law or not, is not the common law generally but the law of that State existing by the authority of that State." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938). This is true whatever "the voice adopted by the State as its own (whether it be of its Legislature or of its Supreme Court)." *Id*. When a state speaks through its courts, it creates new law no less than when it speaks through its legislature.

The Supreme Court has repeatedly recognized that only those state laws passed before the cession of a federal enclave apply on the enclave: "Since only the law in effect at the time of the transfer of jurisdiction continues in force, future statutes of the state are not a part of the body of laws in the ceded area." *James Stewart*, 309 U.S. at 100. This principle applies equally to state common law, and Allison identifies no reason to apply it differently. Nothing in Supreme Court precedent suggests that the federal enclave doctrine does not apply to new laws created by courts the same way that it applies to new laws created by legislatures. And it would be an odd arrangement if a state judicial branch had

-13-

the power to create binding common law that exceeded the reach of the state

legislative branch.[3]

Our conclusion is supported by the weight of authority from other courts.

*See*, *e.g., Cooper v. S. Cal. Edison Co.*, 170 F. App'x 496, 498 (9th Cir. 2006)

(unpublished) ("[C]laims of intentional and negligent infliction of emotional

distress and retaliation" are "barred by the federal enclave doctrine" because they

had not been recognized in California prior to cession of Camp Pendleton.); *Celli*

*v. Shoell*, 995 F. Supp. 1337, 1343–44 (D. Utah 1998) (holding "under federal

enclave jurisdiction, the court applies the state law in effect at the time of the

transfer of jurisdiction," and "[a]ccordingly, the court looks to Utah law in effect

in 1943 to determine whether the state recognized the various common law claims

asserted by plaintiffs.")*; Stiefel v. Bechtel Corp.*, 497 F. Supp. 2d 1138, 1149

(S.D. Cal. 2007) (holding because "[p]laintiff does not argue that a claim for

wrongful termination in violation of public policy comes within a reservation of

jurisdiction or that it was adopted by Congress.  Therefore this claim is barred by

the federal enclave doctrine."); *Sundaram v. Brookhaven Nat. Laboratories*, 424

F. Supp. 2d 545, 569–70 (E.D.N.Y. 2006); *Kelly*, 25 F. Supp. 2d at 6 (explaining

federal enclave "analysis considers whether either the state law existed at the time

---

[3] While federal enclave law locks in place state law at the time of the cession, this is of no moment.  As discussed above, if state law in effect on federal enclaves fell out of date, "Congressional action [would be] necessary to keep it current."  *James Stewart*, 309 U.S. at 100.

-14-

of cession and has not been abrogated by Congress, whether a relevant predecessor state law existed, or whether Congress has specifically acted to make state law applicable on the enclave"); *Orlovetz v. Day & Zimmerman, Inc.*, 848 P.2d 463, 466 (Kan. App. 1993) (rejecting a Kansas law wrongful termination claim because "such remedy must have been available in Kansas at the time of the creation of the federal enclave where plaintiff worked").

In short, federal enclave doctrine applies to state common law adopted after cession in exactly the same manner as it applies to state legislation adopted or amended after cession.

### *New Mexico Statute—NMSA § 38-1-3*

Allison next argues a New Mexico statute that predated the establishment of Kirtland gives later-created employment common law retroactive effect. His contention is that even if common law in general should be treated like state statutory law, NMSA § 38-1-3 was on the books in 1954, and it makes newly recognized common law retroactive to before 1954.

At the time of statehood, New Mexico adopted a statute recognizing the common law of England and America as the law of the new state. Its modern codification provides that "[i]n all the courts in this state the common law as recognized in the United States of America, shall be the rule of practice and decision." NMSA § 38-1-3. Allison argues that because this statute was passed before 1954, all New Mexico common law must also be deemed to the date of the

-15-

statute's enactment.[4]  His argument is better understood as claiming New Mexico, as a part of its reservation of state law when Kirtland was created, preserved the application of future changes to state common law to federal enclaves.

But neither of these theories can be reconciled with the text and history of the New Mexico statute.  The New Mexico Supreme Court has recognized that NMSA § 38-1-3 is the modern codification of the principle that the

> law of England, both statutory and decisional, as developed by Parliament and the courts as of 1776 [was] incorporated into New Mexico law by the Territorial Legislature in 1876.  1876 N.M. Laws, ch. 2 (now codified as § 38-1-3); *see Boddy v. Boddy*, 77 N.M. 149, 152, 420 P.2d 301, 303 (1966) (New Mexico adopted British decisions and non local statutes "which were in force at the time of American separation from England, and made [them] binding as the rule[s] of practice and decision in the courts of this State" through § 38-1-3).

*Torrance Cnty. Mental Health Program, Inc., v. N.M. Health & Env't Dep't.*, 830 P.2d 145, 150 (N.M. 1992).  These laws "and similar decisions, to the extent they do not rest on constitutional requirements, are of course always open to legislative modification; but until such legislative change they represent the rules for decision of legal disputes unless and until changed by subsequent judicial overruling or modification."  *Id.* at 151.

---

[4]  He also makes a broader claim that if *any* state in the Union recognized a common law cause of action, that action would be retroactively available in New Mexico.  Nothing in the statute can be read to incorporate the various laws of other states as New Mexico law, either at statehood or anytime thereafter.

Thus, the statute only served to instruct courts about what precedents to apply when New Mexico was a new state and had few judicial precedents of its own. The "common law" of England as it existed in 1776—and recognized through NMSA § 38-1-3—does not prevent New Mexico from adopting new common law rules. And the statute obviously does not dictate that new common law rules judicially created after the date of statehood should be applied retroactively to the date of statehood just because they are "common law."

Paul *Exception*

Allison's final common law argument is that employment common law causes of action recognized by New Mexico after the cession are retroactive because they are modifications to state law that existed prior to cession rather than new laws. He bases this argument on the regulatory exception the Supreme Court recognized in *Paul*, claiming changes to state common law are no different than changes to any other state regulatory programs that existed at cession.

In *Paul*, the Supreme Court considered whether state milk price control regulations that were set up before the cession of the enclave could be updated by administrative or legislative action after cession. The Court had previously addressed this particular California price control regime and found that it did not apply on a military base that had been ceded to the federal government before the price control regime was enacted. *Pacific Coast Dairy v. Department of*

*Agriculture*, 318 U.S. 285, 294 (1943).[5]   But in *Paul*, the Court considered the regime's application on a different enclave that was ceded *after* the price control regime was established.  The Court was asked to determine which milk prices to use, the prices as of the time of cession or prices later adopted by state regulatory officials.

The Court concluded that the state could modify its regulations pursuant to the program and apply the updated prices to milk sales on the enclave:

> The United States [claims] California is trying to enforce its current regulatory scheme, not the price regulations in effect when the purchases were made.  *Yet if there were price control of milk at the time of the acquisition and the same basic scheme has been in effect since that time, we fail to see why the current one, albeit in the form of different regulations, would not reach those purchases and sales of milk on the federal enclave* made from nonappropriated funds.  Congress could provide otherwise and has done so as respects purchases and sales of milk from appropriated funds.  But since there is no conflicting federal policy concerning purchases and sales from nonappropriated funds, we conclude that the current price controls over milk are applicable to these sales, *provided the basic state law authorizing such control has been in effect since the times of these various acquisitions*.

*Paul*, 371 U.S. at 269 (emphasis added).

---

[5]   Allison points to a case decided the same day as *Pacific Coast Dairy* for support—*Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania*, 318 U.S. 261(1943).  But that case involved regulation on state land, and in no way conflicts with *Pacific Coast Dairy*.  The "distinction between regulation on federal land and on state land was not a technical one, but was necessary to preserve the balance between national and state power and honor Congress' exclusive jurisdiction under the Constitution."  *Black Hills Power and Light Co. v. Weinberger*, 808 F.2d 665, 668 (8th Cir. 1987).

From this, Allison argues that the changes in New Mexico employment law between 1954 and today, which include various shifts away from employment at will rules, are analogous to the maintenance of a regulatory scheme as contemplated by *Paul*. As he articulates it, since New Mexico had employment law before the cession—employment at will—his causes of action are merely relatively minor expansions of that pre-existing law. We disagree.

None of the causes of action Allison raises here are incremental changes to an existing regulatory scheme. Rather, they are substantial new incursions into a field that was previously unregulated, or, if at all, regulated very lightly. Even if *Paul* gave states some authority to modify existing regulatory programs, the causes of action here represent the wholesale adoption and application of a new body of substantive state employment and tort law where none previously existed.

The language in *Paul*, moreover, suggests a narrow interpretation. The Supreme Court held that the newly adopted milk prices could apply *only* if the "same basic scheme" was in place before cession. And the price adjustment was part of the application of the program, not a change in its design. This adjustment is a far stretch from the existence of some general state rule such as the "law of contracts" or even the "law of employment" that would effectively reserve the power of future state judicial or legislative bodies to impose new substantive law in those fields. *Paul*, 371 U.S. at 269. Under Allison's theory of *Paul*, federal

enclave law would be infinitely malleable as long as some general legal principle pre-dated the cession of state land. This interpretation cannot be correct.

In short, this limited rule from *Paul* does not extend to new causes of action developed under the common law, and its exception does not apply here. Thus, Allison can bring his claims only if the state-law causes of action they depend on were available prior to 1954.

### C. New Mexico Law in 1954

We now must examine each of Allison's employment claims to determine whether they would have been available in New Mexico prior to 1954. We find they would not.

### 1. Breach of Implied Contract

Allison's claim for breach of an implied employment contract is based on Boeing's employment manual, which provides certain procedures that Boeing will follow before taking an adverse employment action. He contends that Boeing failed to follow those procedures and breached an implied contract right.

New Mexico did not recognize an implied contract for employment arising from an employment manual until 1980. *See Forrester v. Parker*, 606 P.2d 191 (N.M. 1980); *Sanchez v. The New Mexican*, 738 P.2d 1321, 1324 (N.M. 1987). Allison attempts to avoid this problem by claiming New Mexico common law generally allowed implied contracts prior to 1954. But that does not change the fact that at the time of cession, the New Mexico courts did not recognize an

implied *employment* contract that could be breached by failure to follow certain procedures.

## 2. *Wrongful Discharge*

Next, Allison claims Boeing violated state wrongful discharge law. In support of his position that a cause of action for wrongful discharge was adopted before 1954, Allison cites *Kiker v. Bank Sav. Life Ins. Co.*, 23 P.2d 366, 367 (N.M. 1933). But in *Kiker*, the employee relied on a written employment contract that placed specific limitations on termination. Without a written contract, New Mexico courts in 1954 would not have found common law protection against wrongful discharge. *Vigil v. Arzola*, 699 P.2d 613, 618 (N.M. Ct. App. 1983) (*rev'd on other grounds*, 687 P.2d 1038 (N.M. 1984)).

## 3. *Breach of Covenant of Good Faith and Fair Dealing*

Allison asserts a claim based on the breach of an implied covenant of good faith and fair dealing. But New Mexico courts do not recognize breach of an implied covenant of good faith and fair dealing as a cause of action in at-will employment relationships. *Henning v. Rounds*, 171 P.3d 317, 323 (N.M. Ct. App. 2007); *Bourgeous v. Horizon Healthcare Corp.*, 872 P.2d 852, 856 (1994) ("We have declined to recognize a cause of action in an at-will contract for breach of an implied covenant of good faith and fair dealing."). This cause of action did not exist in 1954 in an at-will employment relationship.

-21-

## 4. Retaliatory Discharge

Allison claims Boeing terminated him in retaliation for exposing corporate misconduct. But in New Mexico the tort of retaliatory discharge was not recognized until thirty years after the cession of the Base. As the New Mexico Supreme Court acknowledged in 1983: "[T]he appellate courts of this State have not to date recognized a cause of action for retaliatory discharge." *Vigil*, 699 P.2d at 618. As with wrongful discharge, the law of New Mexico allowed for termination at will in 1954, and retaliation was not an implied exception to that rule until years later.

## 5. Prima Facie Tort

Finally, Allison pleaded a claim for prima facie tort, a cause of action aimed at unjustified intentional and malicious conduct causing injury. New Mexico first recognized a cause of action for prima facie tort in 1990 in *Schmitz v. Smentowski*, 785 P.2d 726 (N.M. 1990)). *Schmitz* forthrightly stated it was adopting a tort not "recognized by the heretofore accepted areas of intentional tort" on the basis of its common law authority to "to recognize changing circumstances that our evolving society brings to our attention." *Schmitz*, 785 P.2d at 736. While the New Mexico Supreme Court is, of course, entitled to create new theories of tort liability, for our purposes it is clear that the doctrine of prima facie tort did not exist in New Mexico until 1990.

\* \* \*

In sum, none of the employment causes of action raised by Allison in his complaint existed when the federal government established Kirtland Air Force Base.  Allison would have had no cause of action in 1954, and he has no cause of action now.

## III.  Conclusion

For the reasons stated above, we AFFIRM the district court's order of summary judgment.