270 F.2d 530
 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL NO.
839, and International Union of
Operating Engineers, Local No.
370, Appellants,
v.
MORRISON-KNUDSEN COMPANY, Inc., a Corporation, Appellee.
 No. 16102.
 United States Court of Appeals Ninth Circuit.
 July 27, 1959, Rehearing Denied Oct. 29, 1959.
 
 Bassett, Davies & Roberts, Stephen V. Carey, Seattle, Wash., R. Max Etter, Spokane, Wash., for appellants.
 Allen, DeGarmo & Leedy, Gerald DeGarmo, Seattle, Wash., for appellee.
 Before STEPHENS, BARNES and HAMLIN, Circuit Judges.
 HAMLIN, Circuit Judge.
 
 
 1
 Morrison-Knudsen Co., Inc., hereinafter Appellee, obtained a judgment against International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 839, and International Union of Operating Engineers, Local No. 370, hereinafter Appellants, for damages for a breach of contract in the sum of $147,284.41.
 
 
 2
 The action was brought under 301 of the Labor Management Relations Act of 1947 (29 U.S.C.A. 185),[1] and was tried in the United States District Court for the Eastern District of Washington, without a jury. Jurisdiction in this court is under 28 U.S.C.A. 1291.
 
 
 3
 Appellee is a contracting firm and entered into a contract with the United States Atomic Energy Commission for the construction of certain facilities at the Hanford Atomic Products operation. Performance under the contract began on November 28, 1955. In performing this work appellee employed members of the two appellant unions.
 
 
 4
 The amended complaint alleged that appellee was a member of Associated General Contractors of America, Inc., Spokane Chapter (hereinafter AGCA) and that as a member appellee assigned and delegated to AGCA its bargaining rights covering all of appellant's unions as employed by appellee within the area of said locals, including Benton County, Washington. It further alleged that the AGCA, in December, 1955, negotiated and entered into a labor agreement with each of appellant unions effective January 1, 1956. The contracts with each appellant union are identical in all portions pertinent to this action.
 
 
 5
 Each of these labor agreements contained the following clause:
 
 
 6
 'It is mutually agreed that there shall be no strikes, lockouts * * * authorized by either party on account of any labor differences pending the full utilization of the grievance machinery. * * *'
 
 
 7
 The amended complaint further alleged that in direct violation of said agreements (1) appellant unions demanded 'isolation pay' in the sum of $2.62 per day for their members working for plaintiff in the performance of its contract, over and above the wage scales provided by said agreements, (2) 'jointly demanded free transportation for their members * * * from * * * Richland, to the site of the work * * *' and that (3) appellee, through its bargaining agent, refused to accede to these demands, and that appellant unions 'acting in concert and agreement' caused their membership to strike, placed pickets on the job, and that as a result of said actions by appellant unions appellee had suffered damages.
 
 
 8
 The appellants, in their answer, admitted the execution of the contracts of December, 1955, but denied that they had breached said contracts, and denied that the area where the work was being done by appellee was, for the purpose of the labor contracts, a part of Benton County, Washington.
 
 
 9
 Appellant unions, as an affirmative defense, set up in their answer that while the Hanford Works Area where appellee's contract was being performed, was within the exterior boundaries of Benton County, Washington, that Area had always been regarded by labor unions and by contractors as segregated from the remainder of Benton County for the purpose of negotiating labor agreements, and was so regarded when the labor agreements in question were being negotiated. They further alleged that the December, 1955, labor agreements do not apply and were not intended to apply to construction work to be performed by appellee for the Atomic Energy Commission under its contract.
 
 
 10
 Appellants' first specification of error is that the contract between appellee and the Atomic Energy Commission was to be performed wholly within the limits of Hanford Atomic Energy Projects (Hanford Area), a federal enclave, and that that Area as a matter of law is not part of the territory described in the two labor contracts, for the alleged breaches of which appellee claimed damages.
 
 
 11
 The facts concerning the location of the work under appellee's contract generally show that the Hanford Area was acquired by condemnation proceedings by the United States in February and April, 1943. It consisted of land in Benton County, Washington, and in some other surrounding counties, the Area including in excess of 400,000 acres.
 
 
 12
 In 1939 the legislature of the State of Washington had passed certain laws giving consent to the acquisition by the United States of land within the state for 'forts, magazines, arsenals, dockyards and other needful buildings, or for any other purpose whatsoever.' There was further provided by such legislation that 'concurrent jurisdiction with this state in and over any land so acquired by the United States shall be and the same is hereby ceded to the United States * * *.' And in another section there was provided 'the State of Washington hereby expressly reserves such jurisdiction and authority over land acquired or to be acquired by the United States as aforesaid as is not inconsistent with the jurisdiction ceded to the United States by virtue of such acquisition.'
 
 
 13
 In a letter of May 26, 1943, Secretary of War Stimson, referring to this legislation and to certain Congressional legislation, accepted 'concurrent jurisdiction' over all lands, title of record to which had been acquired by the government for military purposes, within the state of Washington. As of the date of this letter, the Hanford Works Area had not in large part been obtained by the United States. On November 8, 1943, Secretary Stimson in a letter to the Governor of the State of Washington called attention to the letter of May 26, 1943, and stated:
 
 
 14
 'Under date of May 26, 1943, the United States accepted concurrent jurisdiction over all lands acquired within that state for military purposes, title to which had vested and over which concurrent jurisdiction had not previously been obtained.
 
 
 15
 'The records of this Department indicate that title to a portion of the Hanford Engineer Works had vested in the United States prior to the above acceptance, and that jurisdiction was thus established over such area.
 
 
 16
 'The War Department does not desire to exercise concurrent jurisdiction over this reservation, but prefers that it remain under the jurisdiction of the State of Washington. It is therefore requested that your records be changed to specifically except the Hanford Engineer Works from the above acceptance, and that all interested state officials be notified to the effect that the portion of this reservation covered by the letter of May 26, 1943, should be restored to the jurisdiction of the State of Washington.'
 
 
 17
 Two other letters of Secretary Stimson on January 4, 1944, and July 31, 1945, were to the same effect. The action of Secretary Stimson in refusing to accept jurisdiction was in accordance with the provisions of 40 U.S.C.A. 255, set out in the margin,[2] which was enacted in 1940.
 
 
 18
 Appellants have contended that the Hanford Works Area is completely within the exclusive jurisdiction of the federal government, and that 'for legal purposes it is no more a part of Benton County than if it were an island of equal size in the Pacific Ocean.'
 
 
 19
 Appellants rely upon Article I, Section 8, of the Constitution of the United States,[3] which gives to Congress the power to exercise exclusive legislation under certain circumstances. Appellants cite many cases for the proposition that federal enclaves, as a matter of law, are no part of the states in which they are located. E.g., Fort Leavenworth R. Co. v. Lowe, 1885, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264; Standard Oil Co. v. People of State of California, 1934, 291 U.S. 242, 54 S.Ct. 381, 78 L.Ed. 775; Pacific Coast Dairy Inc. v. Dept. of Agriculture, 1943, 318 U.S. 285, 63 S.Ct. 628, 87 L.Ed. 761.
 
 
 20
 The cases relied upon by appellant all deal with conflicts in the exercise of jurisdiction between the states and the federal governmemt. Thus: a state's right to tax property of a railroad on a federal enclave, (Fort Leavenworth R. Co. v. Lowe, supra); a state's right to tax a distributor for fuel sold to a governmental agency on a federal enclave, (Standard Oil Co. v. People of State of California, supra); a state's right to revoke a license of a dealer for selling its product to the government at a price below that fixed by state law, where deliveries were made within a federal enclave, (Pacific Coast Dairy Inc. v. Dept. of Agriculture of California, supra). These cases are not in point in determining the rights of the parties in the instant case. We are not here concerned with a conflict of jurisdiction between the state and federal government arising out of activities in the Hanford Area. We are here concerned with the question of what these parties intended when they contracted to do certain work in certain enumerated counties. One of the counties enumerated is Benton County.
 
 
 21
 Furthermore, under the authority of an Act of Congress, certain actions have been taken by the United States Government which show that there was no intent on the part of either the Government or the State of Washington that exclusive jurisdiction over the area in question be obtained by the United States Government.
 
 
 22
 Appellants contend that notwithstanding the action of Secretary of War Stimson as above set out the Atomic Energy Commission under the Atomic Energy Act enacted in 1946, 42 U.S.C.A. 2011 et seq., has exclusive jurisdiction of the lands in question. They rely upon Executive Order No. 9816, 42 U.S.C.A. 2031 note.
 
 
 23
 Section 3 of this Executive Order provides as follows:
 
 
 24
 '3. The Atomic Energy Commission shall exercise full jurisdiction over all interests and property transferred to the Commission in paragraphs 1 and 2 above, in accordance with the provisions of the Atomic Energy Act of 1946.'
 
 
 25
 This did not result in there being transferred to the Atomic Energy Commission anything more than the United States had at that time. If the United States did not at the time of the passage of this Act have exclusive jurisdiction over the Hanford Works Area, and we hold that it did not, it could not transfer to the Atomic Energy Commission something which it did not have.
 
 
 26
 There was also testimony before the trial court that all the criminal laws of the State of Washington were enforced within the Hanford Works, Area by the sheriffs of the various counties, that within the Area there is a Justice of the Peace who has an office and holds court within the Area under the appointment of the county supervisors. The schools within the Area are under the Washington State Department of Education the same as other school districts within the state and receive their per capita from the state. A witness connected with the Atomic Energy Commission testified that he was a resident of the Hanford Works Area and that he voted in state elections as a resident of the State of Washington.
 
 
 27
 Under all the circumstances of this case, we hold that there is no merit to appellants' contention that the Hanford Works Area was not within the territory covered by appellants' labor contracts.
 
 
 28
 Under Specifications of Error 2 and 6, appellants contend that the District Court was in error in striking appellants' affirmative defense and in denying appellants' attempt to show that as a matter of fact when the labor contracts were negotiated the parties did not intend to include the Hanford Works Area as part of the territory covered by the labor contracts.
 
 
 29
 At the time when the court was considering the question of striking the affirmative defense, there was certain colloquy between Court and counsel which is set out in the margin.[4]
 
 
 30
 The contracts entered into by appellants with AGCA contained an article covering the territory and work covered. It read as follows:
 
 
 31
 'Article 2-- Territory and Work Covered:
 
 
 32
 '1. This Agreement shall cover all Heavy, Highway and Engineering construction work in the following counties or parts of counties east of the one hundred and twentieth meridian; Grant * * * Benton * * * and Yakima in the State of Washington; * * * and the north one-half of Idaho County in the State of Idaho.'
 
 
 33
 There is also included in this agreement and made a part thereof, a map which showed all of the various counties covered by the agreement, and showed the location of the 120th meridian. Nowhere on this map was there any indication of any exception therefrom of the property located in the Hanford Works Area.
 
 
 34
 The Court struck out the affirmative defense upon the ground that there was no ambiguity in the contract as to the territory it covered and that to bring in evidence as to what one party contended it covered would be violating the parol evidence rule. The Court's comment at the time he made this ruling is pertinent and set out in the margin.[5]
 
 
 35
 Later, however, in spite of this ruling, as appellants' brief recites, 'most of the evidence which would have been admissible if the affirmative defenses had not been stricken, later came into the record * * *.'
 
 
 36
 At one point, appellant made an offer of proof to the effect that at a meeting on November 3, 1955, during the negotiations leading up to the contract of November 19, 1955, when there was present a representative of the AGCA and of the appellants' unions, that the AGCA representative said that they 'were in nowise interested in the Hanford Project and were not negotiating on any conditions for the Hanford contract because it was an old agreement to which different fringe benefits were attached.' An objection by the appellee that this was an attempt to vary the terms of the contract by showing the pre-contract negotiations, was sustained by the Court.
 
 
 37
 We agree with the holding of Judge Driver that there was no ambiguity in the paragraph which described the area to be covered by the contracts, and that under the familiar rule forbidding the use of parol evidence to vary the unambiguous terms of a contract, the ruling of the District Court sustaining the objections to the offer of proof was proper. Schwieger v. Harry W. Robbins & Co., 1955, 48 Wash.2d 22, 290 P.2d 984; United Artists Corp. v. Strand Productions, 9 Cir., 1954, 216 F.2d 305.
 
 
 38
 Appellants' third specification of error is divided into three parts: (a) That appellee was not a party to either of the labor contracts involved; (b) that appellee precipitated the work stoppage or strike; and (c) that appellee failed to comply with the provisions of the labor Contracts by making written demand for arbitration.
 
 
 39
 Appellants' claim under specification 3(a) was that because appellee's signature does not appear upon the contracts that it was not a party thereto. Appellee, as indicated earlier, was a member of the Associated General Contractors of America, Inc., Spokane Chapter, and the latter organization signed the contracts with the appellants' unions. The record indicates that the AGCA was designated the agent of appellee to negotiate labor contracts in the area in question. The Court made a finding to that effect. The appellants rely upon the case of Ketcher v. Sheet Metal Workers, D.C.Ark.1953, 115 F.Supp. 802, which held that an employer member of an employers' association which did not physically affix its signature to a labor contract negotiated on its behalf by such association, cannot maintain an action under 29 U.S.C.A. 185(a). The same question was raised in the case of Farina Bros. Co. v. United Brotherhood of Carpenters, D.C.Mass.1957, 152 F.Supp. 423. The Court in the Farina case refused to follow the Ketcher case, holding that an employer could bring an action where the bargaining had been done on behalf of the employer by an employer association.
 
 
 40
 We prefer to follow the reasoning of the Farina case and hold that in this action there was no bar to the appellee bringing the action for a breach of the labor contracts.
 
 
 41
 Under specification 3(b) appellants contend that the appellee precipitated the work stoppage. Suffice it to say that upon this point the trial court made a finding adverse to the appellants upon the basis of all of the evidence. We hold there is ample evidence to support this finding.
 
 
 42
 Under specification 3(c) appellants contend that appellee failed to comply with the provisions of the labor contracts by failing to make written demand for arbitration when the dispute arose between appellant unions and appellee. Appellants made no pleading in the trial court tendering this issue, nor did they propose any findings of fact or conclusions of law in support thereof. While their action in this regard might justify this court in not examining the point under Federal Rules of Civil Procedure, Rule 12(h), 28 U.S.C.A., Sorenson v. United States, 9 Cir., 1955, 226 F.2d 460, we nevertheless have examined the record. It appears that during the discussions just prior to the strike between the parties there was testimony by the executive secretary of the AGCA that on behalf of appellee he had offered to arbitrate the disputes, and that he was told by a representative of the Teamsters that they would not arbitrate, and by a representative of the Engineers that he could not arbitrate. The attitude of one of the appellant union representatives was indicated by his testimony set out in the margin.[6] The evidence does not disclose any willingness on the part of the appellant unions to arbitrate, in fact, it discloses just the opposite attitude.
 
 
 43
 We find no merit in appellants' point 3(c).
 
 
 44
 Appellants' specification of error 5 contends that the award of $147,284.41 as damages is excessive. A detailed statement of all of the claimed items of damage would unduly lengthen this opinion. Suffice it to say that we have examined the record and there is sufficient evidence to support each item of damage included in the total amount.
 
 
 45
 Appellants' Specifications of Error 7, 8 and 9, to-wit, that the trial Court erred in denying appellants' motion to dismiss, that the Court erred in adopting the Findings and Conclusions of the Court submitted by appellee upon the issue of liability, and that the Court erred in refusing to adopt the Findings of Fact and Conclusions of Law requested by the appellants, need not be discussed in detail. If the trial Court had followed these three contentions of the appellants, of course, an entirely opposite conclusion would have been reached by the District Court in its judgment.
 
 
 46
 There remains only to be discussed appellants' Specification of Error No. 4. Appellants' position in this regard is that the appellee failed to prove any joint and several liability against the two appellants in the amount of $147,284.41, or in any amount. It further contends that the evidence failed to establish what amount, if any, is properly chargeable to the Teamsters, and what amount, if any, is properly chargeable to the Engineers.
 
 
 47
 The form of the judgment as rendered by the Court is set out in the margin.[7]
 
 
 48
 As we view it, the District Court made a determination of the amount of damage suffered by the appellee, and rendered a judgment against each appellant in that amount. It provided, however, that the appellee could not collect 'from said defendants, either individually or jointly, more than the total amount of the judgment, interest and costs as aforesaid.'
 
 
 49
 The evidence shows that each appellant, during the whole period of the disputes, from December 31, 1955, until the date of the work stoppage on March 22, 1956, acted in concert. They each refused to submit the matters in dispute to arbitration; they each stated that their members would not go to work if the buses were taken off; and they each participated in the work stoppage on March 23. Thereafter, each appellant union established pickets on April 5, 1956. The Court found that each union, jointly and severally, made demands upon the appellee which were not covered by the labor contracts and that each union 'acting in concert caused their respective membership to strike the work of Plaintiff under its contract * * * and to cease all work thereon or for Plaintiff, and on April 5, 1956, caused the work of Plaintiff to be picketed, which strike and refusal to work continued to and up until the 6th day of June, 1956.' The actions of each union were breaches of its contract with appellee, which resulted in the damage to the appellee as found by the Court, and each appellant could be liable for said damage to appellee in the total amount.
 
 
 50
 We do not agree with appellants' contention that the District Court by its judgment attempted to convert the suits for breach of contract into actions for tort. The judgment ran against each appellant on the ground that each appellant had breached its contract with appellee and that appellee had been damaged thereby.
 
 
 51
 The provision that the Court inserted in the judgment 'that the satisfaction of said judgment against either defendant shall automatically operate as a pro tanto satisfaction of the judgment against the other defendant, to the end that plaintiff shall in no event collect from said defendants, either individually or jointly, more than the total amount of the judgment, interest, and costs as aforesaid' was a provision inserted for the benefit of appellants, and we hold that it gave them no cause for complaint.
 
 
 52
 Judgment is affirmed.
 
 
 
 [1]
 '185. Suits by and against labor organizations-- Venue, amount, and citizenship
 '(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.'
 
 
 [2]
 '255. Title to land to be purchased by United States; acquisition by United States of jurisdiction over lands
 'Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted.'
 
 
 [3]
 The Constitution of the United States, Article I, Section 8, provides that:
 'The Congress shall have Power * * * to exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance by Congress, become the Seat of Government of the United States, and to exercise like Authority over all Places purchased, by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings.'
 
 
 [4]
 'The Court: Pardon me, Mr. DeGarmo, before you proceed, I think I should inquire as to whether counsel for defendants feel that this section of their affirmative defense adequately states your position. In other words, are you intending to rely on this language in your permanent defense, or do you think you have evidence that will not--
 'Mr. Carey: I can't speak for Mr. Etter but speaking only for myself we are relying upon the affirmative defense as pleaded in our answer to the amended complaint. There is some variation.
 'Mr. DeGarmo: That is the one.
 'The Court: The one set out here?
 'Mr. DeGarmo: Yes, that is correct.
 You can check it with your answer as
 I read it to the Court now.
 'The Court: The thought I had in mind, I don't want to spend considerable time here and have them come in and say, 'We'd like to amend it because we have evidence here that will go beyond.' If you intend to rely on this it can be determined on this motion.
 'Mr. Carey: As far as I know, I have no reason to think that we are not going to rely on that as stated.
 'The Court: Is that true of you, too, Mr. Etter?
 'Mr. Etter: Yes; there is an amended answer for the Engineers. If Mr. DeGarmo is reciting from that affirmative defense we are relying on that, yes.'
 
 
 [5]
 'It seems to me that here would be bringing evidence to show that while the contract was made to cover Benton County as a geographical unit, as a county, and certainly nobody would have any doubt as to what Benton County, Spokane County or any other county means so far as its covering a particular area is concerned
 'I also have in mind that in matters of this importance the parties here, Morrison-Knudsen, these Local and International Unions, Joint Council of Teamsters, are not like a grocer or a couple of grocers getting together and making a contract without the benefit of counsel or with perhaps counsel who is employed on the spur of the moment. These people are well represented. They have adequate legal staffs and legal representation.
 'They certainly knew, as everyone knows, what the situation was with reference to the Hanford area and if they did not intend to, if they intended it should be excluded from this contract it seems to me that the lawyers on one side or the other would have spelled it out in plain English and said so.'
 
 
 [6]
 'Q. Well, you were insisting that all the terms and provisions of the Hanford Agreement were in effect. Were you also recognizing the grievance and arbitration procedures, if such there be, under the Hanford Works Agreement, or did you just want the good part and leave the bad out? A. I repeatedly stated that I couldn't agree to any settlement that would provide for a cut in take-home pay for my members employed on that project
 'Q. You made that statement repeatedly, didn't you? A. Many times.
 'Q. That regardless or what the contract said, you weren't going to take any cut in pay? A. That's right.'
 
 
 [7]
 'It Is Further Ordered, Adjudged and Decreed that the last paragraph of the Judgment entered herein April 14, 1958, be, and the same is hereby amended and changed to read as follows:
 "It Is Further Ordered, Adjudged and Decreed, that Morrison-Knudsen Company, Inc., a corporation, plaintiff herein, is hereby granted judgment against each of said defendants, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 839, and International Union of Operating Engineers, Local No. 370, in the sum of $147,284.41, together with interest thereon at the rate of 6% per annum from the date of entry of this judgment until paid, together with costs and disbursements of plaintiff to be taxed against each of said defendants in the manner as provided by law. It Is Further Ordered that the satisfaction of said judgment against either defendant shall automatically operate as a pro tanto satisfaction of the judgment against the other defendant, to the end that plaintiff shall in no event collect from said defendants, either individually or jointly, more than the total amount of the judgment, interest, and costs as aforesaid."