**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

|  |  |
|---|---|
| LEON PEOPLES, individually, | No. 45110-7-II |
| Appellant, | PUBLISHED OPINION |
| v. |  |
| PUGET SOUND'S BEST CHICKEN!, INC. d/b/a POPEYE'S CHICKEN & BISCUITS, a Washington corporation; and BENNIE MARTIN, individually, and 'JANE DOE" MARTIN and the marital community comprised thereof, |  |
| Respondents. |  |

BJORGEN, A.C.J. — Leon Peoples sued Puget Sound's Best Chicken! Inc., doing business as Popeye's Chicken & Biscuits, along with Bennie Martin and Martin's marital community (collectively, Popeye's),[1] for events occurring during his employment at a Popeye's restaurant on Joint Base Lewis-McChord (JBLM). The trial court granted summary judgment in favor of Popeye's based on the federal enclave doctrine and dismissed Peoples's lawsuit without prejudice after determining that it lacked subject matter jurisdiction.

On appeal, Peoples argues that the trial court erred by dismissing his lawsuit for lack of subject matter jurisdiction and by granting summary judgment based on the federal enclave doctrine, because his causes of action predated Washington's cession of the land comprising JBLM to the federal government.

---

[1] Where necessary, we refer to Puget Sound's Best Chicken! and to Martin and the Martin marital community individually.

We partially reverse the order of summary judgment. The federal enclave doctrine bars state law causes of action arising from events occurring on a federal enclave if the cause of action did not exist in state law at the creation of the enclave. The trial court correctly determined that Peoples's statutory discrimination and intentional infliction of emotional distress (outrage) causes of action did not exist when Washington ceded the land encompassing JBLM to the federal government. Summary judgment on these claims was appropriate. However, Peoples's negligent hiring or retention cause of action existed in Washington's common law before cession of the JBLM land, making summary judgment in favor of Puget Sound's Best Chicken! inappropriate on this claim.

We also reverse the order of dismissal for lack of subject-matter jurisdiction. The trial court's decision to dismiss Peoples's lawsuit assumed that he had no valid state law claims, an assumption that our partial reversal of the order of summary judgment renders erroneous. Consequently, we reverse in part and remand the matter for further proceedings.

## FACTS

Peoples alleges that during his employment Martin, his manager, subjected him to degrading taunts based on his sexual orientation and that his employer took no action to stop the harassment despite notice of its occurrence.

Peoples filed suit against Popeye's in Pierce County Superior Court, claiming (1) violations of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, (2) outrage, and (3) negligent hiring or retention.

Popeye's moved for summary judgment on its claims under CR 56(c) and dismissal of Peoples's complaint based on CR 12(b)(1). Popeye's argued that the trial court should grant summary judgment in its favor because the events at issue occurred on a federal enclave and the

federal enclave doctrine barred Peoples's state law causes of action. Popeye's conceded that Peoples might have valid federal claims under Title VII of the Civil Rights Act of 1964,[2] but contended that, until Peoples exhausted his administrative remedies, the trial court lacked subject matter jurisdiction over these claims. Because no evidence suggested that he had done so, Popeye's moved the trial court to dismiss Peoples's lawsuit without prejudice

The trial court granted Popeyes's CR 56(c) and CR 12(b)(1) motions, dismissing Peoples's complaint without prejudice. Peoples now appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

We review de novo an order granting summary judgment, performing the same inquiry as the trial court. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013). We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from the evidence in that party's favor. *Lakey*, 176 Wn.2d at 922. Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file," along with any affidavits, show that no material issues of fact exist and that the moving party is entitled to judgment as a matter of law. CR 56(c).

We review de novo an order dismissing a suit for lack of subject matter jurisdiction. *See Mendoza v. Neudorfer Eng'rs, Inc.*, 145 Wn. App. 146, 149, 185 P.3d 1204 (2008). A trial court "only has authorization to hear and determine a cause or proceeding only if it has jurisdiction over the parties and the subject matter." *Mendoza*, 145 Wn. App. at 149. Where the trial court lacks subject matter jurisdiction, it "may do nothing other than enter an order of dismissal." *Inland*

---

[2] 42 U.S.C. § 2000 et seq.

*Foundry Co. v. Spokane County Air Pollution Control Auth.*, 98 Wn. App. 121, 123-24, 989 P.2d 102 (1999).

## II. SUMMARY JUDGMENT

The parties first dispute the propriety of the trial court's grant of summary judgment in favor of Popeye's. Peoples contends that the federal enclave doctrine does not bar his claims because they existed in Washington's law before JBLM became a federal enclave. Popeye's contends the doctrine does bar his claims because they did not exist before the creation of the JBLM enclave. After surveying federal enclave law, we analyze its application to Peoples's claims and conclude that, although the doctrine barred his WLAD and outrage claims, it did not bar his claims for negligent hiring or retention.

### A. Federal Enclave Law and JBLM

The "federal enclave doctrine operates as a choice of law doctrine that dictates which law applies to causes of action arising" on land that has become a federal enclave. *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1235 (10th Cir. 2012). The doctrine applies where a state voluntarily cedes land to the federal government, allowing the United States to exercise exclusive legislative jurisdiction over the land.[3] *State v. Lane*, 112 Wn.2d 464, 468-69, 771 P.2d 1150 (1989); *Allison*, 689 F.3d at 1235; *see* U.S. CONST., art. I, § 8, cl. 17 (authorizing Congress "[t]o exercise exclusive legislation . . . over all Places purchased by the consent of the legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.").

---

[3] The terms of cession dictate the extent of the federal government's jurisdiction over an enclave. *State v. Lane*, 112 Wn.2d 464, 469, 771 P.2d 1150 (1989).

4

Because the State cedes its legislative jurisdiction over the enclave, legislation enacted by the State after cession of the enclave land has no effect on it without "'clear and unambiguous'" authorization from the United States Congress. *Dep't of Labor & Indus. v. Dirt & Aggregate, Inc.*, 120 Wn.2d 49, 52-53, 837 P.2d 1018 (1992) (quoting *Hancock v. Train*, 426 U.S. 167, 179, 96 S. Ct. 2006, 48 L. Ed. 2d 555 (1976)); *Allison*, 689 F.3d at 1244. However, the creation of a federal enclave does not eliminate all vestiges of state legislative authority: state laws in place at the creation of the enclave remain in effect unless displaced or preempted by federal law. *Dirt & Aggregate*, 120 Wn.2d at 52 n.1.

The creation of a federal enclave also prevents the application to the enclave of any state common law developed after cession. Causes of action recognized by a court function no differently than causes of action created by the legislature; both are "'the law of th[e] State existing by the authority of th[e] State,'" and creation of the enclave makes the federal government, not the State, the enclave's sovereign authority. *Allison*, 689 F.3d at 1240 (quoting *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)). Accordingly, unless displaced by federal authority, a plaintiff may pursue common law causes of action arising from events occurring on a federal enclave if the state's common law recognized the cause of action before the creation of the enclave. *Allison*, 689 F.3d at 1240-41. However, a plaintiff may not pursue causes of action developed by a state's common law after the creation of the federal enclave, *Allison*, 689 F.3d at 1240-41, unless expressly authorized by Congress. *Cf. Dirt & Aggregate*, 120 Wn.2d at 53.

With permission and approval from the state legislature, Pierce County ceded the land encompassing JBLM to the federal government in 1919. *Lane*, 112 Wn.2d at 469. The terms of cession vested the United States with exclusive legislative jurisdiction over JBLM. *Lane*, 112

5

Wn.2d at 469-70. Consequently, JBLM became a federal enclave in 1919. *Lane*, 112 Wn.2d at 469-70.

B.      The Application of the Federal Enclave Doctrine to Peoples's Claims[4]

Peoples's complaint makes no federal claim, and he makes no argument that the United States has authorized the application of the WLAD or Washington's common law to the base. Under the case law just summarized, therefore, the propriety of summary judgment based on the federal enclave doctrine turns solely on whether Peoples's causes of action existed before Washington ceded the land now comprising JBLM to the federal government. We now turn to those claims.

1. WLAD Claims

Our legislature enacted the WLAD in 1949 to discourage employment discrimination on the basis of race, creed, color, or national origin. *Griffin v. Eller*, 130 Wn.2d 58, 63, 922 P.2d 788 (1996). WLAD now bars other types of discrimination, such as discrimination based on sexual orientation. LAWS OF 2006, ch. 4, §§ 1-18. Within the WLAD, the legislature provided a civil cause of action for a violation of its provisions. RCW 49.60.030(2).

Because the legislature did not enact the WLAD until 1949, it was not effective at the creation of the JBLM enclave in 1919. In consequence, WLAD never regulated conduct on JBLM

---

[4] Peoples contends that the trial court should have analyzed the application of the federal enclave doctrine to his claims differently for defendant Martin, Martin's marital community, and Puget Sound's Best Chicken! As noted above, the federal enclave doctrine serves as a choice of law doctrine applicable where events giving rise to a suit occur on a federal enclave. *Allison*, 689 F.3d at 1235. The identity of the actors involved in those events is irrelevant to the doctrine. If applicable, the doctrine bars claims against defendant Martin and his marital community just as it bars claims against Puget Sound's Best Chicken!

or provided a cause of action for WLAD violations occurring there. *Dirt & Aggregate*, 120 Wn.2d at 52; *Allison*, 689 F.3d at 1239, 1240, 1244. Popeye's was entitled to judgment as a matter of law on Peoples's WLAD claims under the federal enclave doctrine.

Peoples asks that, if we hold that the federal enclave doctrine bars his WLAD claims, we remand the matter with orders to allow him to amend his complaint to bring the claims as common law tort claims for wrongful discharge in violation of public policy. The tort of wrongful discharge in violation of public policy did not exist in this state until long after the creation of the JBLM enclave, and Peoples cites no authorization for such claims by the United States Congress. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984) (stating explicitly that the court was recognizing a new cause of action with its opinion). Accordingly, the federal enclave doctrine bars claims for wrongful discharge in violation of public policy, just as it bars WLAD claims.

### 2. Outrage

Although "[l]iability for outrage is of ancient lineage," American jurisdictions initially did not allow for recovery based on outrageous conduct, except if part of an assault or if committed by a common carrier. *Contreras v. Crown Zellerbach Corp.*, 88 Wn.2d 735, 738-39, 565 P.2d 1173 (1977). Reflecting this, the American Law Institute's original *Restatement of Torts*, published in 1934, "stated flatly [that] there was no liability" for outrage, subject to those two exceptions. *Contreras*, 88 Wn.2d at 739; *Browning v. Slendera Sys.*, 54 Wn.2d 440, 447, 341 P.2d 859 (1959), *overruled on other grounds by Nord v. Shoreline Sav. Ass'n*, 116 Wn.2d 447, 805 P.2d 800 (1991) (quoting RESTATEMENT OF TORTS § 46 (1934)). However, because cases imposing liability for outrage began appearing in the common law after 1934, the institute published in 1948 a supplement to the *Restatement of Torts* that recognized the tort. *Contreras*, 88 Wn.2d at 739; *Browning*, 54 Wn.2d at 447-48 (quoting RESTATEMENT OF TORTS § 46, suppl. (1948)). Following

the institute's lead, Washington explicitly recognized a cause of action for outrage in 1975. *Contreras*, 88 Wn.2d at 737-39 (citing *Grimsby v. Samson*, 85 Wn.2d 52, 530 P.2d 291 (1975)).

Outrage claims appear unknown in American common law before 1934, subject to the two exceptions in the 1934 Restatement, and unrecognized in Washington before 1975. Outrage claims therefore did not exist in Washington's common law at the creation of the JBLM enclave in 1919. Consequently, a state law cause of action for outrage does not exist for conduct on JBLM, and Popeye's was entitled to summary judgment on this claim as well. *Allison*, 689 F.3d at 1240-41.

Peoples argues that Washington's common law recognized a claim of outrage prior to cession of the JBLM land based on our Supreme Court's decision in *Anderson v. Pantages Theater Co.*, 114 Wash. 24, 194 P. 813 (1921). That case involved a claim that the theater company had denied an African-American ticketholder his seat at a performance based on his race. *Anderson*, 114 Wash. at 25-26. The cause of action in *Anderson* was created by a statute that proscribed racial discrimination in places of public accommodation, not by the common law. *Anderson*, 114 Wash. at 27-28. The theater company's behavior, and the consequent emotional damage to the plaintiff, was discussed only as a measure of damages for the violation of the statute, rather than as the basis for the plaintiff's cause of action. *Anderson*, 114 Wash. at 30-32. Because *Anderson* does not show that a cause of action for outrage existed at the time of the creation of the JBLM enclave, it does not aid Peoples. *Allison*, 689 F.3d at 1240.

### 3. Negligent Hiring or Retention[5]

Peoples's pleadings in the trial court, and his briefing before our court, appear to combine several theories of tort liability into a single tort, that of negligent hiring, retention, supervision, and training. Liability for negligent hiring or retention arises because the employer failed to exercise ordinary care by hiring or retaining an employee known to be unfit. *Scott v. Blanchet High Sch.*, 50 Wn. App. 37, 43, 747 P.2d 1124 (1987) (quoting 53 Am. Jur. 2d *Master & Servant*, § 422 (1970)). These torts are distinct from negligent supervision or training where an employer's liability arises based on the failure to exercise ordinary care in supervising an employee. *Scott*, 50 Wn. App. at 44. In arguing that his claim is not barred by the federal enclave doctrine, Peoples cites only case law concerning negligent hiring or retention. Consistently with *Skagit County Public Hospital Dist. No. 1 v. Department of Revenue*, 158 Wn. App. 426, 440, 242 P.3d 909 (2010), we confine our analysis to those claims.

The parties direct our attention to different cases bearing on whether the torts of negligent hiring or retention existed before the creation of the JBLM enclave. Peoples cites *Matsuda v. Hammond*, 77 Wash. 120, 137 P. 328 (1913), and argues that it shows negligent hiring or retention claims existed before 1919. Popeye's, in contrast, claims that no liability for negligent hiring or retention existed before *La Lone v. Smith*, 39 Wn.2d 167, 234 P.2d 893 (1951).

*Matsuda* involved an assault arising from the sale of a crate of strawberries. *Matsuda*, 77 Wash. at 121-22. The plaintiff sued both the store manager, who punched him, and the manager's

---

[5] A successful negligent retention claim imposes liability on the employer for his or her own negligence in retaining an unfit employee, not for the employee's wrongful act. *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 48, 929 P.2d 420 (1997) (citing *Scott v. Blanchet High Sch.*, 50 Wn. App. 37, 43, 747 P.2d 1124 (1987)). As defendant Martin could not have negligently retained himself under these facts, the trial court properly granted him and his marital community summary judgment on the claim.

employer. *See Matsuda*, 77 Wash. at 122. After the jury returned a verdict for the plaintiff, the

manager and his employer appealed. *Matsuda*, 77 Wash. at 122. When discussing the employer's

liability for the manager's conduct, the court wrote:

> On behalf of [the employer], the additional contention is made that the [manager], when he assaulted and beat the respondent, was not acting within the scope of his authority. This contention, we think, is well founded. The authority of [the manager], as shown in the record, was to act as general manager of [the employer's] business. This grant of authority would unquestionably authorize [the manager] to make collections for goods sold from [the employer's] place of business, and to exact settlements for goods wrongfully taken therefrom; but it would not, without something more, render [the employer] liable for unlawful acts of [the manager] committed while making such collections or settlements. *An employer is liable for the unlawful and criminal acts of his employ[ee] only when he directly authorizes them, or ratifies them when committed; or, perhaps, continues an employ[ee] in his employment after he has knowledge that the employ[ee] has committed, or is liable to commit, unlawful acts while in the pursuit of his employer's business.*

*Matsuda*, 77 Wash. at 123 (emphasis added). The italicized portion of *Matsuda* appears to

generally apply the rule that certain employers immune from vicarious liability could be liable for

their own failure to exercise ordinary care in selecting or retaining an unfit employee. *E.g.*,

*Richardson v. Carbon Hill Coal Co.*, 10 Wash. 648, 655-56, 39 P. 95 (1895).

The Supreme Court has twice cited *Matsuda* as recognizing liability for negligent hiring or

retention. First, in *Estes v. Brewster Cigar Co.*, 156 Wash. 465, 473-74, 287 P. 36 (1930), the

court wrote that:

> [t]here is a line of cases, to which we have lent sanction in [*Matsuda*], to the effect that a master is liable for the unauthorized wrongful acts of his servant, if he continues the servant in his employment after he has knowledge that the servant has committed, or is liable to commit wrongful acts while in the performance of the duties for which he is employed.

(Internal citation omitted.)

Later, in *La Lone*, the court wrote that

> [o]ur decisions in [*Matsuda*], [*Estes*], and *Miller v. Mohr*, while not directly on point, *recognize the legal principle that the negligent employment or retention of*

*an incompetent employee makes the employer liable for injuries inflicted upon a third party by such employee.*

*La Lone*, 39 Wn.2d at 171 (internal citations omitted) (emphasis added).

These decisions show that Washington's common law recognized the torts of negligent hiring or retention before the state ceded the land comprising JBLM to the federal government. The language in *Matsuda*, italicized above, contains the elements of these torts. *Compare Matsuda*, 77 Wash. at 123 *with Betty Y. v. Al-Hellou*, 98 Wn. App. 146, 148-49 & n.3, 988 P.2d 1031 (1999) (elements of the torts of negligent hiring and retention). Further, the Supreme Court itself stated that *Matsuda* recognized employer liability for negligent employment or retention in principle. *La Lone*, 39 Wn.2d at 171.[6]

Popeye's contends that *Matsuda* did not establish the torts of negligent hiring or retention, but simply analyzed vicarious liability. Popeye's appears to argue that no claim for negligent hiring or retention existed until a court actually imposed liability on the theories, which happened in *La Lone*. We disagree. While Popeye's correctly notes that the *Matsuda* court did not hold that the employer negligently retained the manager, that result appeared to result from the lack of evidence that the employer knew of the manager's violent tendencies. *See* 77 Wash. at 121-22 (no evidence about manager's predisposition to violence in the statement of facts). As noted, in *Estes* the court stated that *Matsuda* recognized negligent retention claims, 156 Wash. at 473, and in *La Lone* the court analyzed the negligent retention claim there based on principles already recognized

---

[6] *Estes* and *Matsuda* were negligent retention cases. 156 Wash. at 473-74; 77 Wash. at 123. *Miller* discussed negligent hiring or retention. *Miller v. Mohr*, 198 Wash. 619, 633-34, 89 P.2d 807 (1939). *Miller* cited *Bise v. St. Luke's Hospital*, 181 Wash. 269, 43 P.2d 4 (1935) in support of the proposition that an employer may be negligent in hiring or retaining an unfit employee. *Miller*, 198 Wash. at 633-34. For its part, *Bise* cited a number of cases for support for that same rule; at least two of these cases discussed negligent hiring and predate cession of the JBLM land. *Bise*, 181 Wash. at 271 (citing *Wells v. Ferry-Baker Lumber Co.*, 57 Wash. 658, 659-60, 107 P. 869 (1910)); *Richardson*, 10 Wash. at 655-56.

11

in *Matsuda*, rather than as if it were confronting an issue of first impression. 39 Wn.2d at 171. Whether or not *Matsuda* held that the employer in that case was negligent for retaining the manager, its analysis established the tort of negligent retention in Washington.

Because Washington's common law recognized causes of action for negligent hiring or retention before cession of the JBLM land, Popeye's was not entitled to summary judgment on the claim based on the federal enclave doctrine. We reverse the order of summary judgment with regard to Peoples's negligent hiring and retention claims against Puget Sound's Best Chicken!

III. SUBJECT MATTER JURISDICTION

The parties next contest the propriety of the trial court's dismissal of Peoples's suit based on its lack of subject matter jurisdiction. We agree that the trial court erred in concluding that it lacked jurisdiction over Peoples's complaint.

In granting Popeyes's motion to dismiss for lack of subject matter jurisdiction, the trial court assumed that Peoples had no valid state law claims. This assumption arose from its grant of summary judgment on all of Peoples's claims based on Popeyes's federal enclave doctrine argument. Because we reverse the grant of summary judgment with regard to Peoples's negligent hiring or retention claims against Puget Sound's Best Chicken!, the trial court's assumption was erroneous. Since Peoples had valid state law claims, his failure to exhaust his administrative remedies for federal claims that he never made was irrelevant. We reverse the order of dismissal and remand the matter for further proceedings.

CONCLUSION

We affirm the grant of summary judgment in favor of Popeye's as to Peoples's WLAD and outrage claims, but reverse the order of summary judgment as it pertains to Peoples's negligent hiring or retention claim against Puget Sound's Best Chicken! We also reverse the order of

12

dismissal because the superior court had subject matter jurisdiction over Peoples's state law negligent hiring or retention claim against Puget Sound's Best Chicken!  We remand the matter for further proceedings consistent with this opinion.

BJORGEN, A.C.J.

We concur:

Maxa, J.

MELNICK, J.