# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| LORENZO G. SANDOVAL, | No.  49001-3-II |
| Appellant, | |
| v. | |
| CHERYL L. SULLIVAN, JOSEPH SALVAGGI, JOSEPH C. MAY, PAT GLEBE, DENNIS DAHNE, DAN PACHOLKE, BERNARD WARNER, WASHINGTON STATE DEPARTMENT OF CORRECTIONS, DEPARTMENT OF ENTERPRISE, OFFICE OF RISK MANAGEMENT, AND GREG PRESSEL, ALL SUED IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES, | UNPUBLISHED OPINION |
| Respondents. | |

BJORGEN, C.J. — Lorenzo Sandoval brought suit under 42 U.S.C. section 1983 against

the Department of Corrections (DOC) and its individual employees, Cheryl Sullivan, Joseph

Salvaggi, Pat Glebe, Joseph May, Dennis Dahne, Dan Pacholke, and Bernard Warner

(collectively, Defendants).[1] Sandoval argued the Defendants violated (1) his Fourteenth Amendment procedural due process rights, (2) his right to meaningfully access the courts, (3) his Eighth Amendment right to not be subject to calculated harassment, and (4) his right to be free from retaliation for exercising his First Amendment rights. The Defendants moved for summary judgment on all claims, and the trial court granted the motion.

Sandoval appeals, arguing that the trial court erred in determining that no genuine issues of material fact exist regarding his claims against Defendants. We hold that Sandoval fails to raise a genuine issue of material fact on any of his claims, and we affirm.

FACTS

I. INITIAL MAIL RESTRICTIONS, INVESTIGATION, AND SEARCH OF SANDOVAL'S CELL

In 2010, Sandoval was incarcerated at Stafford Creek Corrections Center. During his incarceration, staff were authorized by DOC Policy 450.100 to inspect and read an inmate's incoming and outgoing mail to prevent:

1.      Receiving or sending contraband or any other material that threatens the security and order of the facility through the mail, and

2.      Criminal activity.

---

[1] The trial court also granted summary judgment in favor of defendants Department of Enterprise Services, Department of Risk Management, and Greg Pressel. Sandoval does not argue on appeal any claims related to them, and we thus do not reach claims related to those parties.

Clerk's Papers (CP) at 256. In addition, DOC Policy 450.100 did not permit mail contact between two prisoners unless approved by a DOC supervisor.

In August 2010, DOC staff screened and restricted[2] three pieces of mail that involved attempted correspondence between Sandoval and Eddie Shamp, another incarcerated individual. Shamp and Sandoval were attempting to use a third party, Manny Velez, as a proxy to contact each other. Neither Sandoval nor Shamp had permission to contact each other directly. As a result, DOC initiated an investigation into Sandoval's misuse of the mail system.

As the investigation continued, DOC screened and restricted approximately 13 additional pieces of Sandoval's incoming and outgoing mail. Donna Dixon, a DOC mailroom staff member, initially restricted each piece of mail, and Sullivan, a DOC mailroom sergeant, approved each restriction.

Some of the mail was restricted because Sandoval was asking individuals for money in exchange for legal services, a practice prohibited by DOC Policy 450.100,[3] without the prior permission of the superintendent. Other pieces were restricted because they were again attempted communications between Sandoval and Shamp through a third party. The contents of some of the restricted letters show that Sandoval was assisting Shamp with his legal matters.

Additionally, in order to assist Shamp with his legal matters, Sandoval came into possession of Shamp's legal materials and papers. Under DOC Policy 590.500, "[o]ne offender

---

[2] To "restrict" mail in this context is apparently the same as to withhold it subject to the procedures in WAC 137-48-040 and -050.

[3] Under DOC Policy 450.100, an offender may not send mail that "solicits goods or money from other than an immediate family member of the offender without the prior permission of the Superintendent." CP at 271.

may confer with another offender in researching and preparing legal pleadings." CP at 371.

However,

> [a]n offender voluntarily assisting another offender in legal matters may possess the other offender's legal documents/papers only in the Law Library during regular Law Library hours when both offenders are present.

CP at 371.

Further, three pieces of the restricted mail included money orders that were sent to Sandoval. One of the money orders was sent from an unknown sender; the other two money orders were from Warren Bell, a previously incarcerated individual Sandoval was helping to file a civil suit against DOC. DOC restricted each of these money orders as part of its investigation into Sandoval's misuse of the mail system.

Based on Sandoval's violations of DOC policies, Sullivan ordered a search of Sandoval's cell. Her principal reason for ordering the search was to recover any legal documents that belonged to Shamp to enforce DOC Policy 590.500. DOC officers, Salvaggi and Kelly Bisher, executed the search, during which Sandoval was not present. Although Sandoval alleges that they left his cell ransacked and in disarray, there is no evidence in the record to support that assertion. Among other items, Salvaggi and Bisher recovered two envelopes containing Shamp's legal documents and papers.

Based on all the evidence recovered from the restricted mail and the search of Sandoval's cell, Sullivan charged Sandoval with the following four infractions:

> My investigation of Sandoval's restricted mail in August/September 2010 led me to believe he had committed the following violations of WAC 137-25-030[(1), Category D]: [No.] 811 — Entering into an unauthorized contract; [No.] 725 — Any telephonic or written correspondence with any offender in a correctional facility without prior written approval of the superintendent/community corrections supervisor/designee;

4

> [No.] 714 — Giving, selling, borrowing, lending, or trading money or anything of value to, or accepting or purchasing money or anything of value from, another offender or that offender's friend(s) or family, the value of which is ten dollars or more; and [No.] 656 — Giving, receiving, or offering any person a bribe or anything of value for an unauthorized favor or service.

CP at 383-84. In the infraction report, Sullivan erroneously assigned the date of August 30, 2010 to five pieces of mail, which actually were received on different dates. Sandoval, however, received mail restriction notices for all of the withheld mail, including the five pieces with the incorrect date.

A disciplinary hearing for Sandoval's infractions took place on October 4, 2010. Sandoval testified, in part, that he never received any mail restrictions dated August 30, 2010. Sandoval pled guilty to a single reduced infraction for "[No.] 303 [u]sing the mail, telephone, or electronic communications without authorization." Former WAC 137-28-220 (2006); CP at 386-88. His remaining infractions were dismissed.

## II. EVENTS AFTER THE INFRACTION HEARING

### A.     Initial Request for Restricted Mail

On October 12, Sandoval sent a message to the mail room, asking that his mail be returned to him or that DOC staff "hold [them] until this lawsuit is final."[4] CP at 250. Sullivan responded that DOC would hold the mail for him.

### B.     Money Orders and Separate Civil Lawsuit

On November 7, Sandoval sent another message to the mail room, asking that DOC staff send out his restricted money orders now that the disciplinary hearing was over. Sullivan

---

[4] It is not clear from the record what "lawsuit" Sandoval was referring to.

responded, "OK, [p]lease provide a pre-franked envelope." CP at 394. Under DOC Policy 450.100(XI)(A), "[o]ffenders must pay for their own postage costs." CP at 265. However, "[i]ndigent offenders with outgoing mail, including legal mail, may receive postage credit up to the equivalent of 5 first class pre-franked envelopes per week for mailing costs." CP at 265. Sandoval never provided the mail room with addressed, pre-franked envelopes.

In 2011, Sandoval filed grievances against DOC staff, requesting that his money orders be released. Specifically, Sandoval wanted to use the money orders to pay $37.50 in costs to the Thurston County Superior Court Clerk to prepare his clerk's papers for an appeal of a civil case unrelated to this appeal. A DOC staff member found that this was "[n]on-grieviable [sic]: well beyond grieviable timeframes." CP at 979-80.

In his unrelated case, Sandoval moved the trial court to be designated indigent to allow his appeal to be paid for by public expense. Sandoval prepared an order that directed the public to pay for "papers on review which are reproduced by the Clerk of the Appellate Court" and "[p]reparation of original documents to be reproduced by the Clerk." CP at 424. The trial court signed that order.

Despite this, Sandoval represented to the appellate court that DOC staff were impermissibly holding his money so that he could not pay the $37.50. Sandoval subsequently cancelled his designation of his clerk's papers. Ultimately, a commissioner of this court dismissed the case for want of prosecution under RAP 18.9.

In January 2012, Sandoval sent a message to the facility administration, again asking about his money orders. Glebe, superintendent of DOC, responded with the following letter:

> You state in August 2010 you received an infraction for misuse of mail privileges. As a part of that infraction, your sanction was loss of mail privileges with Ms.

6

Deshand and Mr. Bell. Accordingly, you did not or will not receive mail and/or money they sent.

You were not retaliated against nor was your access to court denied at any time.

CP at 976.

In July 2012, Sandoval sent another message, asking for DOC staff to deposit his money orders into his account or to send his money out. May, a DOC captain, responded to "provide [him] the rejection [number]s." CP at 974. No evidence in the record suggests that May was provided with those numbers.

C.      Legal Documents

Sandoval sent numerous messages asking DOC staff to return his legal papers. In response, Sandoval received two letters relevant to this appeal. One from Pacholke, deputy director of the DOC Prisons Division, and the other from Warner, director of the DOC Prisons Division.

Pacholke's October 21, 2010 letter states in pertinent part:

[DOC staff] reported to me that on September 24, 2010, staff confiscated legal documents belonging to offender Eddie Shamp . . . during a search of your cell and personal paperwork. In addition, they reported that they confiscated a number of pieces of personal correspondence documenting that you are receiving payment from offenders for assisting them in their legal work. The legal documents belonging to offender Shamp were sent to Captain May for property disposition and you received an infraction for this behavior.

. . . .

I would encourage you to follow policy regarding your ability to assist other offenders with their legal work. You cannot accept any form of payment for this assistance, nor can you be in possession of another offender's legal material/ documents.

CP at 983.

Similarly, Warner's December 20, 2010 letter provides in pertinent part:

You stated you were infracted for possessing another offender's legal papers and that you had purchased those papers from Clark County Superior Court. You were infracted for receiving payment from offenders for assisting them with their legal work. You were provided a hearing and your infractions were either dismissed or reduced.

Possession of another offender's legal paperwork is not allowed [under] DOC policy 590.500. . . .

Receiving another offender's documents in the mail violates this . . . policy and the mailroom was correct in restricting it.

CP at 860-61.

On November 19, 2010, Sandoval signed a property disposition report filled out by Dahne, DOC Grievance Coordinator. That report indicates that Sandoval agreed to place the legal documents "on hold pending grievances & appeals." CP at 955.

### III. PROCEDURE

Sandoval filed a 43-page amended complaint against the Defendants, bringing several claims under 42 U.S.C. section 1983. Sandoval alleged that the Defendants violated (1) his procedural due process rights under the Fourteenth Amendment by failing to provide him with proper mail restriction notices and by unlawfully restricting the legal documents and money orders, (2) his right to meaningfully access the courts by withholding the money orders, (3) his Eighth Amendment right to not be subject to calculated harassment, evidenced by the destructive search of his cell, and (4) his right to be free from retaliation for

exercising his First Amendment rights to assist others with legal matters, evidenced by the restricting and withholding of the legal documents.[5]

The Defendants moved for summary judgment in the trial court dismissing all of Sandoval's claims. One of the exhibits to Defendants' motion was Sullivan's declaration, acknowledging that she erroneously assigned the August 30, 2010 date to five pieces of mail in her infraction report. Sandoval opposed the Defendants' motion for summary judgment. He also moved to strike any evidence associated with Sullivan because she is "[p]atently unbelievable or untrustworthy" because of the error in the infraction report. CP at 159-61.

The trial court granted summary judgment in favor of the Defendants on all claims. The record is unclear whether the trial court declined or granted Sandoval's motion to strike.

Sandoval appeals.

---

[5] Sandoval does not argue on appeal that the trial court erred in dismissing his claims for injunctive and declaratory relief, or common law negligence, or those under the Washington State Constitution. Therefore, we do not address them.

The Defendants argue that Sandoval did not raise a Fifth Amendment claim on appeal, but he arguably did raise it in his brief as part of his procedural due process claim. However, a Fifth Amendment due process claim applies only to federal actors. *Martinez-Rivera v. Sanchez Ramos*, 498 F.3d 3, 8-9 (1st Cir. 2007). Sandoval does not allege that any of the Defendants are federal actors. *Id.* Accordingly, any claim based on the due process clause of the Fifth Amendment fails.

ANALYSIS

I. STANDARD OF REVIEW AND SECTION 1983 LEGAL PRINCIPLES

"'We review de novo an order granting summary judgment, performing the same inquiry as the trial court.'" *Nichols v. Peterson NW, Inc.*, 197 Wn. App. 491, 498, 389 P.3d 617 (2016) (quoting *Peoples v. Puget Sound's Best Chicken!, Inc.*, 185 Wn. App. 691, 695, 345 P.3d 811 (2015)). "'A party moving for summary judgment bears the initial burden of showing the absence of an issue of material fact.'" *Id.* (quoting *Kofmehl v. Baseline Lake, LLC*, 177 Wn.2d 584, 594, 305 P.3d 230 (2013)). "'We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from the evidence in that party's favor.'" *Id.* (quoting *Peoples*, 185 Wn. App. at 695). "'Summary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file,' along with any affidavits, show that no material issues of fact exist and that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting CR 56(c)). However, "[m]ere allegations, argumentative assertions, conclusory statements, and speculation do not raise issues of material fact that preclude a grant of summary judgment." *Greenhalgh v. Dep't of Corr.*, 160 Wn. App. 706, 714, 248 P.3d 150 (2011).

Under 42 U.S.C. section 1983, a plaintiff may recover damages if he can show that (1) a person has deprived the plaintiff of a federal constitutional or statutory right and (2) that person acted under color of state law. *Robinson v. City of Seattle*, 119 Wn.2d 34, 58, 830 P.2d 318 (1992). Further, a plaintiff must establish that the defendant's unlawful conduct proximately

caused him or her harm. *See Gausvik v. Abbey*, 126 Wn. App. 868, 885, 107 P.3d 98 (2005).

"The causation element of [section] 1983 is met if the plaintiff shows the defendant official 'set[] in motion a series of acts by others which the [official] knows or reasonably should know would cause others to inflict the constitutional injury.'" *Jones v. State, Dep't of Health*, 170 Wn.2d 338, 351, 242 P.3d 825 (2010) (alterations in original) (quoting *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987)).

## II. MOTION TO STRIKE

As a threshold matter, we turn to Sandoval's argument that the trial court abused its discretion by denying his motion to strike the infraction report and other associated documents because Sullivan admitted that she erroneously attributed an incorrect date to five pieces of mail. We review the trial court's decision on the motion to strike for abuse of discretion. *Farmer v. Davis*, 161 Wn. App. 420, 431, 250 P.3d 138 (2011).

Assuming the trial court did not strike the evidence, that decision was not an abuse of discretion. Sullivan's admission that she erroneously attributed an incorrect date to five pieces of mail does not make the evidence inadmissible. Accordingly, this claim fails.

## III. PROCEDURAL DUE PROCESS

To state a procedural due process claim, a plaintiff must show (1) a liberty or property interest protected by the constitution, (2) a deprivation of that protected interest by the government, and (3) that the deprivation occurred without due process. *See Durland v. San Juan County*, 182 Wn.2d 55, 70, 340 P.3d 191 (2014); *Greenhalgh v. Dep't of Corr.*, 180 Wn. App. 876, 890, 324 P.3d 771 (2014).

Sandoval argues that he was not afforded due process on three bases: (1) that Sullivan's incorrect notations on the incident report show that he never received mail restriction notices for five pieces of mail, (2) that Sullivan, Dahne, Warner and Pacholke withheld his legal documents regarding Shamp's case, violating the process he is due, and (3) that Sullivan, Glebe, and May, withheld Sandoval's money orders, violating the process he is due. For the reasons below, we find that Sandoval fails to raise genuine issues of material fact on these claims and that Defendants were entitled to judgment as a matter of law.

A.     Inadequate Notice

Sandoval argues that he did not receive due process because Sullivan's errors on the infraction report show that he never received mail restriction notices for five pieces of mail dated August 30, 2010. We disagree.

In the context of withholding an inmate's mail, the process due is (1) that an inmate be notified of the withholding, (2) that he be given a reasonable opportunity to protest those decisions, and (3) that his complaints be referred to a prison official other than the person who originally disapproved the correspondence.[6] *See Procunier v. Martinez*, 416 U.S. 396, 418-19, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989).

The Defendants provided uncontroverted evidence that despite Sullivan's mistake in her initial serious infraction report, Sandoval nonetheless received notices for each restricted piece of mail. Sandoval does not point to evidence that Sullivan's mistake somehow undermined his ability to protest the mail restrictions. It is concerning that despite Sandoval's repeated

---

[6] Sandoval does not argue from this third requirement.

grievances, nobody informed Sandoval that he had already received those notices until this lawsuit was filed. However, even though DOC staff failed to inform Sandoval that he already possessed the pertinent mail restriction notices, that error does not show that he was denied the process that was constitutionally due.

On the uncontroverted evidence in the record, Sullivan's mistake did not deprive Sandoval of procedural due process.

B.      Legal Documents

Sandoval argues that he was not afforded due process because Sullivan, Dahne, Warner, and Pacholke, unlawfully restricted and withheld Shamp's legal documents from Sandoval. Sandoval's claim fails because he waived any claim he had for the DOC's handling of those documents.

Sullivan initially withheld the legal documents as evidence for his infraction hearing. After the hearing, Sandoval signed a property disposition report filled out by Dahne, agreeing to place the legal documents "on hold" pending grievances and appeals. CP at 955. Sandoval's affirmative assent defeats any claim that Sullivan, Dahne, Pacholke, or Warner interfered with his ability to retrieve them.

Sandoval alleges in his reply brief that Dahne coerced him into signing the property disposition report. However, a conclusory statement in a brief does not constitute evidence creating a genuine issue of material fact. *See Greenhalgh*, 160 Wn. App. at 714. To support his coercion argument, Sandoval also cites to the property disposition report and Dahne's interrogatory responses, where Dahne states that Sandoval told him to hold the legal materials. Neither of these documents, however, show that Sandoval was "coerced" into signing the

property disposition form. Nor is coercion shown by the Dahne Declaration at CP 1229-30, also cited by Sandoval.

Because the Defendants submitted uncontroverted evidence that Sandoval agreed to have DOC staff hold his legal documents, he does not create a genuine issue of fact that the legal documents were held without due process.

C.      Money Orders

Sandoval argues that he was denied due process because Sullivan, Glebe, and May withheld his money orders. We disagree.

A prison's negligent or unauthorized intentional deprivation of an inmate's property does not violate procedural due process if "adequate state post-deprivation remedies are available." *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). Assuming without deciding that Sullivan, Glebe, and May intentionally withheld Sandoval's money orders, the available grievance process provided Sandoval with a post-deprivation remedy. The record reflects that on November 7, 2010, Sandoval requested his money orders to be sent out to the non-incarcerated individuals. Sullivan responded that she would send out the money orders if he provided a pre-franked envelope. The Defendants submitted evidence that indigent inmates have access to five pre-franked envelopes a week. Despite this, Sandoval failed to provide the pre-franked envelopes, and the money orders continued to be withheld.

Sandoval argues in his brief that he provided a pre-franked envelope to Sullivan to send out the money orders to the non-incarcerated individuals. To support that proposition, Sandoval cites to Glebe's 2012 letter, which states that Sandoval would not be able to personally receive the money orders as part of his sanction for misusing mail privileges. However, the assertion

14

two years later that Sandoval was not entitled to receive the money orders does not undermine the proposition that Sullivan still allowed him to send those money orders out to other individuals as long as he provided pre-franked envelopes. In addition, Glebe's letter does not raise an issue of fact as to whether Sandoval provided DOC with pre-franked envelopes to send out the money orders in 2010.

Sandoval also cites to his many grievances filed after November 2010 indicating that he was continuing to ask DOC staff about his money orders. However, these continued grievances do not contravene the Defendants' evidence that Sandoval was given a post-deprivation opportunity in November 2010 to send out those money orders. DOC staff was not required to give repeated or continual post-deprivation opportunities to an individual in order to satisfy procedural due process.

Accordingly, because Sandoval fails to raise a genuine issue of material fact that the post-deprivation remedy was inadequate, this claim fails.

## IV. MEANINGFUL ACCESS TO COURTS

Sandoval argues that the withholding of his money orders prevented him from paying the fee for preparation of clerk's papers in a separate appeal, resulting in the dismissal of that appeal. Sandoval, however, fails to create a genuine issue of material fact on causation.

Incarcerated individuals have a constitutional right to meaningfully access the courts. *Bounds v. Smith*, 430 U.S. 817, 821, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977); *Silva v. Di Vittorio*, 658 F.3d 1090, 1102 (9th Cir. 2011), *overruled on other grounds by Davis v. Gibson*, 670 Fed. Appx. 941 (2016). This includes an individual's right to litigate his claims in court without active interference from the prison. *See Silva*, 658 F.3d at 1103. An individual must establish

15

that a prison's "active inference" caused him to suffer an actual injury in order for his claim to survive summary judgment. *See Nevada Dep't of Corr. v. Greene*, 648 F.3d 1014, 1018 (9th Cir. 2011). "Actual injury . . . is 'actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim.'" *Greene*, 648 F.3d at 1018 (quoting *Lewis v. Casey*, 518 U.S. 343, 348, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)).

The Defendants submitted uncontroverted evidence that Sandoval moved the trial court in his other civil case to be designated indigent to permit his appeal to be paid for at public expense. Sandoval prepared an order that provided for the public to pay for "papers on review which are reproduced by the Clerk of the Appellate Court" and "[p]reparation of original documents to be reproduced by the Clerk." CP at 424. The trial court signed that order.

The Thurston County Superior Court Clerk later requested Sandoval pay $37.75 to prepare his designation of clerk's papers. It is unclear why the clerk did not have information regarding Sandoval's indigence. Instead of informing the clerk of his indigence, Sandoval responded that DOC staff was withholding his money orders that would enable him to pay the fee. But Sandoval did not need the money orders to pay for the clerk's papers and he had some understanding of how indigent status works in the courts, as he had prepared the indigency order and obtained its signature by the trial court.

Thus, even assuming that Sullivan, Glebe, and May withheld his money orders, Sandoval fails to create a genuine issue of material fact that the withholding caused his other suit to be dismissed.[7]

---

[7] The Defendants also argue that "a deprivation of his right to appeal the summary judgment dismissal of an unrelated civil rights action . . . does not constitute actual injury." Br. of Respondents at 15. However, in *Silva*, 658 F.3d at 1104, the Court held that dismissal of Silva's

### V. CALCULATED HARASSMENT

Sandoval argues that the improper search of his cell, ordered by Sullivan and executed by Salvaggi, subjected him to calculated harassment, violating his Eighth Amendment rights. We disagree.

The Eight Amendment protects prisoners from "calculated harassment unrelated to prison needs." *See Hudson*, 468 U.S. at 530. Calculated harassment involves more than ordinary lack of due care for a prisoner's interests or safety. *See Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986). Instead, the harassment must be something akin to "'unnecessary and wanton infliction of pain'" to constitute cruel and unusual punishment. *Id.* (quoting *Ingraham v. Wright*, 430 U.S. 651, 670, 97 S. Ct. 1402, 51 L. Ed. 2d 711 (1977)).

> [W]hether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Whitley*, 475 U.S. at 320-21 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Sandoval alleges that he was subjected to calculated harassment for helping Shamp with his legal matters. Specifically, he believes his cell was ransacked and torn apart as a way to harass him. To support that his cell was ransacked, he cites to the affidavit of Michael Robtoy, an inmate, who apparently had witnessed Sandoval's cell around the time of the search. However, Robtoy never states that the cell had been torn apart in any fashion. Instead, Robtoy's

---

pending civil suits was an actual injury for purposes of his 42 U.S.C. section 1983 claim for deprivation of access to the courts. By analogy, the deprivation of Sandoval's right to appeal would also constitute an actual injury.

declaration reflects that he gave Sandoval advice to videotape the search or take a picture of his cell before the search occurred. This does not provide any evidence that the cell was ransacked. Sandoval also cites to the declaration of Salvaggi, one of the officers who conducted the cell search. Salvaggi's declaration, however, contains nothing to support Sandoval's allegation.

Sandoval does not point to evidence in the record showing that his cell was ransacked or left in disarray. Therefore, he fails to create a genuine issue of material fact on his calculated harassment claim.

## VI. RETALIATION

Sandoval argues that Sullivan retaliated against him for assisting Shamp with his legal matters. We disagree.

Retaliation by a public official for the exercise of a constitutional right is actionable under 42 U.S.C. section 1983. *Am. Civil Liberties Union of Maryland, Inc. v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993). A court evaluates a retaliation claim involving a prisoner in light of the deference afforded to prison officials. *Parmelee v. O'Neel*, 145 Wn. App. 223, 247, 186 P.3d 1094 (2008), *rev'd in part on other grounds*, 168 Wn.2d 515 (2010). A viable First Amendment retaliation claim in the prison context requires

> (1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

A successful retaliation claim thus requires a finding that the action failed to advance legitimate penological goals, such as preserving institutional order and discipline. *Parmelee*, 145 Wn. App. at 247. Consequently, whether Sullivan's actions can be classified as

18

"retaliatory" requires an evaluation of whether DOC Policy 590.500 and the actions taken pursuant to it served legitimate penological goals.

The primary objective of the correctional system is to provide the maximum feasible safety for the public, staff, and inmates. *Livingston v. Cedeno*, 164 Wn.2d 46, 52-53, 186 P.3d 1055 (2008). RCW 72.09.530 directs DOC staff to screen all incoming and outgoing materials and intercept any "contraband" in order to protect legitimate security concerns within the state penal institutions. *Livingston*, 164 Wn.2d at 52-53. Contraband means, in part, items which an inmate may not have in his possession as defined in regulations adopted by DOC. WAC 137-36-020(1); *see also* RCW 72.09.015(5). DOC Policy 590.500 permits an offender to possess another offender's legal documents only in a law library where both offenders are present. Thus, DOC Policy 590.500, taken together with the noted legislative and regulatory directives, show that possessing another offender's legal materials outside of the law library is implicitly considered possession of "contraband," the interception of which would serve legitimate penological goals.

Sandoval has the burden to establish that Sullivan's actions "failed to advance legitimate penological goals, such as preserving institutional order and discipline." *Parmelee*, 145 Wn. App. at 247. Sandoval argues that his First Amendment right to assist other individuals with their legal matters demonstrates that DOC Policy 590.500 serves no penological interest. We agree that generally an inmate possesses a First Amendment right to assist others with their legal matters. *See Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985); *accord Johnson v. Avery*, 393 U.S. 483, 89 S. Ct. 747, 21 L. Ed. 2d 718 (1969); *Shaw v. Murphy*, 532 U.S. 223, 121 S. Ct. 1475, 149 L. Ed. 2d 420 (2001). However, the existence of that First Amendment right does not

19

create a genuine issue of fact as to whether DOC Policy 590.500, in itself, is not reasonably related to any penological interest.

Sullivan found that Sandoval was repeatedly abusing DOC's mail system, including improper receipt and possession of legal documents concerning Shamp. She ordered the search under DOC Policy 590.500 to recover any improperly possessed legal documents. Because DOC Policy 590.500 and the actions taken under it are related to legitimate penological goals, Sandoval cannot establish a genuine issue of material fact on his retaliation claim.

Sandoval also separately argues that the legal documents were public records and he ordered them from the Thurston County Superior Court Clerk. In *Livingston*, 164 Wn.2d at 49-50, an inmate filed a public disclosure request against DOC for records concerning an employee. DOC sent the requested public records to the inmate, but then restricted that mail under DOC Policy 450.100, which prevents inmates from "receiving material that threatens the security and order of the facility." *Id.* at 49. Our Supreme Court upheld DOC's actions because, although the DOC was required to comply with the public disclosure request, it had discretionary authority to apply a policy designed to protect the institution. *Id.* at 57.

Even assuming Sandoval legitimately ordered the legal documents from the Thurston County Superior Court Clerk, DOC Policy 590.500 does not allow an offender to possess another offender's legal documentation outside the library. Consistent with *Livingston*, this means that DOC could still restrict his possession of legal documents, whether received directly from another offender or ordered as public records.

No. 49001-3-II

For these reasons, Sandoval has failed to create a genuine issue of fact as to whether

DOC Policy 590.500 is reasonably related to a penological purpose. Thus, Sullivan's execution

of DOC Policy 590.500, in itself, does not show that she retaliated.

CONCLUSION

We affirm the summary judgment in favor of Defendants.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_Bjorgen, C.J._

BJORGEN, C.J.

We concur:

_Worswick, J._

WORSWICK, J.

_Johanson, J._

JOHANSON, J.

21